STATE of Tennessee, Appellee,

v.

Jonathan Vaughn EVANS,
Defendant–Appellant.

Supreme Court of Tennessee,
at Knoxville.

Sept. 14, 1992.

Mark A. Skelton, John S. Anderson, Rogersville, R.J. Tucker, Newport, for defendant-appellant.

Charles W. Burson, Atty. Gen. & Reporter, Rebecca L. Gundt, Asst. Atty. Gen., Nashville, Berkeley Bell, Dist. Atty. Gen., John Dugger, Jr., Asst. Dist. Atty. Gen., Morristown, for appellee.

OPINION

DROWOTA, Justice.

The Defendant, Jonathan Vaughn Evans, appeals his conviction of first-degree felony murder of Mary Slover and the sentence of death. On appeal he challenges the sufficiency of the evidence used to convict him, numerous alleged errors committed by the trial court prior to and during trial, and the constitutionality of the death penalty.

Mary Slover, a grocery store clerk, was murdered on the morning of February 5, 1989, shortly before 8 a.m. during a robbery at a By–Lo Market in Morristown. The Defendant Evans, having worked at the By–Lo from January through July of 1988, knew the victim and also knew the combination to the safe.

The Defendant's presence at the By–Lo Market near the time of the murder was clearly established. Both he and his car were observed in the By–Lo parking lot between 7:50 and 7:55 a.m. Shortly before 8 a.m., a witness saw the Defendant driving at a high rate of speed away from the By–Lo area. Mary Slover was found dead by customers at approximately 8:10 a.m., lying face-up in a back aisle of the store, next to the safe, with her head in a pool of blood. The autopsy revealed a single gunshot wound in the back of her head fired from a .25 caliber automatic pistol.

Later that day a blue bank bag and telephone receiver, taken from the market, and a .25 caliber pistol were seen in the Defendant's car. A month earlier, a gun belonging to the Defendant's landlady was reported missing; about this time, the Defendant gave his girlfriend a similar gun. Ballistic examinations revealed that the bullet removed from Mary Slover's head was fired from the landlady's missing gun. The Defendant was seen with a large amount of cash after the market robbery and murder.

Based upon the above evidence, the jury convicted Evans of the first-degree felony murder of Mary Slover. We have carefully considered all of the Defendant's contentions as to the guilt phase and find no error. At the sentencing phase the jury found that Evans committed the murder both while engaged in the robbery and in an effort to avoid arrest.[1] The jury determined that the aggravating circumstances outweighed any mitigating circumstances offered in Evans's defense and sentenced the Defendant to death.

In our most recent capital case dealing with aggravating circumstance (i)(7), *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992), a majority of this Court held that use of the aggravating circumstance in T.C.A. § 39-2-203(i)(7) to impose a sentence of death in cases of felony murder violates the Eighth Amendment to the United States Constitution and Article I, Section 16, of the Tennessee Constitution. The same majority today reverses the sentence of death and remands this case for a re-sentencing hearing. The State will be free to re-seek the death penalty if it so desires. Justice O'Brien and I dissent from this holding for reasons found in my dissenting opinion in *Middlebrooks*.

## I.

## SUFFICIENCY OF THE CONVICTING EVIDENCE

■ The Defendant contends that the State of Tennessee failed to carry its burden of proving guilt beyond a reasonable doubt, that the evidence is not sufficient to support the jury's verdict, and that the evidence actually preponderates in favor of his innocence. The Defendant submits that, while the State was able to show that the deceased, Mary Slover, was killed during the course of a robbery, it failed to prove beyond a reasonable doubt that he committed the crime.

Because the sufficiency of the evidence is challenged, we shall set out the surrounding facts and circumstances of the crime in greater detail. Evans worked the night shift at Flowers Baking Company in Morristown. Upon reporting to work on Saturday evening, February 4, 1989, he asked his supervisor for permission to leave work thirty minutes early the next morning in order to attend his sister's baptism. On Sunday morning, February 5, 1989, the Defendant left work at 7:30, fifteen minutes early. At approximately 7:35, when Cindy Johnson delivered papers to the By-Lo Market, there were no cars or individuals present. Still on her route, Ms. Johnson returned to the area about 7:45 and observed a two-toned automobile with tinted windows approach her and drive in the direction of the By-Lo Market. Tina Cloud, who lives near the market, went to get her paper between 7:50 and 7:55. At that time, she observed Evans's car, a two-toned brown car with tinted windows, parked in the By-Lo parking lot. The driver's side window was approximately three-quarters of the way down, and she was able to identify Evans inside the car. At approximately the same time, George Simpson also saw the Defendant's car parked in the By-Lo parking lot and recognized Mary Slover standing in the doorway of the market. Other evidence adduced at trial indicated that Ms. Slover clocked in at 7:42 a.m. When Mr. Simpson left the parking lot a few minutes before 8:00, the Defendant's car was still parked at the market. Around 8:00 another witness, Eugene Ellis, saw a car with tinted windows and a black "car bra" across the front grill driving away from the By-Lo area at a high rate of speed. By the time Ellis reached

---

1. The jury found two aggravating circumstances:

    (6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

    (7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

T.C.A. §§ 39-2-203(i)(6) and (7) (1982), now T.C.A. §§ 39-13-204(i)(6) and (7) (1991).

the By–Lo market, only Mary Slover's car was in the parking lot.

Ronnie Helton arrived at the By–Lo Market between 8:05 and 8:10 a.m. He noticed that the keys to the market were still in the lock on the inside of the door. He selected something to drink and waited at the cash register. While he was waiting, Mary Thomas arrived at the market to purchase gas. Gary Hannah also arrived to get coffee. When no one came to wait on them, Helton and Hannah looked throughout the market for a clerk. Helton saw the body of Mary Slover lying on the floor next to the open safe, with her head in a pool of blood. Police and an ambulance were summoned. When the police arrived at approximately 8:21 a.m., the market was in disarray. The cash register was open and empty, the safe was open and empty, and the telephone receiver and cord were missing. When paramedics arrived at approximately 8:25 a.m., the victim had no pulse or respiration.

The police investigation revealed that two blue zippered First Tennessee Bank bags were missing and approximately $1,300 was stolen, including $800—$900 in $20 bills and $130 in coins. The investigation further disclosed that the Defendant did, in fact, drive a two-toned brown automobile with tinted windows. A search of his vehicle yielded a black "car bra" from the trunk.

Doctor Sung J. Chung, a pathologist and Director of the Department of Pathology at Morristown–Hamblen Hospital, testified that the victim died within a very few minutes of a gunshot to the back of the head. A .25 caliber bullet was removed from the victim's brain. Dr. Chung testified that before the fatal gunshot wound was inflicted, Ms. Slover had apparently been struck on the head by a blunt instrument, "suggestive of [an] injury inflicted by a telephone receiver." The area of impact "was suggestive of ... a moderately heavy blow ... [a] blow that could have caused unconsciousness."

Testimony by ballistics experts opined that the bullet removed from Mary Slover's brain was fired from the gun that the Defendant's landlady, Shannon Bussell, had reported missing from her home on January 2, 1989, a silver .25 caliber automatic pistol. Evans rented a room from Ms. Bussell in December 1988. Ms. Bussell, a single parent, occupied her home with her five children. Having reported the missing gun to the police, she asked the Defendant if he had taken it, and he responded, "No." Ms. Bussell, in late 1988, had used her pistol for target shooting in New Market, Tennessee, at the home of John Abbott. Two .25 caliber projectiles were retrieved from the place she stated she had used her pistol for target practice. These projectiles, together with the bullet removed from the victim's brain, were tested. Dr. Michael McCoy and Dr. A.M. Brown at the Walters State Community College crime lab, and Steve Scott at the T.B.I. laboratory examined these bullets and concluded that all three had been fired from the same weapon.

Johnny Bussell, the seven year old son of Ms. Bussell, testified that on the afternoon of the crime, while riding with the Defendant in the Defendant's car, he opened a "speaker box" on the Defendant's back seat and saw his mother's missing handgun. He also noticed a blue zippered bank bag under the driver's seat of Evans's car. When the Defendant opened his trunk to fix a flat tire that same day, Johnny Bussell testified he saw a cracked telephone receiver with an attached cord. Johnny's fifteen year old sister, Tabitha, also saw the telephone receiver and cord in the Defendant's trunk.

On the day of the Slover murder, the Defendant arrived at the home of Ms. Bussell, at approximately 8:05 or 8:10 a.m. He gathered his clothes for church and left around 8:15 a.m. He then went to the home of his girlfriend, Angelica Lee, and showered and dressed for church. Sometime between 8:30 and 9:00 a.m., he called Roderick Ellington, a friend and co-worker, and informed him of the murder of a clerk at the By–Lo Market. This conversation occurred approximately two hours before Evans was actually told by police officers that Mary Slover was dead. Ellington also

testified that he had twice before seen Evans with a silver .25 caliber automatic pistol.

Evans and Ms. Lee left her apartment around 9:15 a.m., went to a restaurant for breakfast, stopped by the bakery to pick up the lunch pail Evans had forgotten, and drove to Kingdom Hall in Jefferson City to attend church. After the church services, Evans and Ms. Lee returned to Morristown and drove by the By–Lo Market. Seeing the commotion at the market, the Defendant stopped and asked Officer Harrison what had happened. The officer testified it was approximately 11:00 a.m. when he informed Evans that Mary Slover had been killed.

On the afternoon of the murder, the Defendant was observed with a roll of twenty and fifty dollar bills. The next day, the Defendant paid $135 in cash for a rifle and $180 in cash to redeem Ms. Lee's jewelry from an area pawn shop. He also made two separate deposits of $200 in cash at different branches of the Merchants & Planters Bank. On the same day, he and Ms. Lee rolled over $100 worth of change in wrappers he had received from Ms. Bussell. He gave Ms. Lee $25 in change to make a payment to a friend for a car. Ms. Bussell testified that Evans told her family that he was being questioned in regard to the Slover murder and that they should refuse to answer police questions about him. Tanya Bussell, age 16, testified that Evans admonished her not to speak with the police about him except to say that he first came to their home on February 5 at 7:45 a.m., rather than shortly after 8 a.m.

The Defendant denied taking Ms. Bussell's .25 caliber pistol and stated that he had never owned a handgun. At trial, Ms. Bussell was asked if she confronted Evans about her missing pistol; she replied that she asked him "if he took it to give to [his girlfriend, Ms. Lee] because [she] was supposed to be having trouble with her husband. And he said, No." Although the Defendant denied having any knowledge of Ms. Bussell's missing pistol, at trial his girlfriend, Ms. Lee, testified that the Defendant had purchased a silver .25 caliber automatic pistol and had given it to her. Ms. Lee testified that on Tuesday morning, after the murder, the Defendant telephoned her and asked her "to go in the kitchen and take the pistol that was in the kitchen and put it up somewhere." She stated: "He said something to the effect that the police had been there and questioned him or talked to him and if they came over there that it wouldn't look good for it to be there." Ms. Lee followed Defendant's instructions and hid the pistol. The next day, Wednesday, February 8, Evans removed the weapon from Ms. Lee's home and disposed of it.

In his statement, Evans stated that he left work at approximately 7:50 a.m. As he was going to Shanon Bussell's home to pick up his clothes, he realized that he had left his lunch pail at work, so he pulled into the By–Lo parking lot to turn around. He saw Pete Cloud's daughter going to the mail box to get the paper. He also saw someone delivering papers in a white Chevette. He then realized that because it was ten minutes till eight, he did not have time to get his lunch pail, so he went to Ms. Bussell's house around 8 a.m., got his clothes, and went to his girlfriend's house to take a shower before church.

Based upon the above proof, the Defendant was convicted of first degree murder. At a separate sentencing hearing, the State incorporated by reference the evidence offered during the guilt phase of the proceeding. The Defendant took the stand, denied any involvement in the murder, and asked the jury to sentence him to life imprisonment. Similarly, relatives and friends of Evans testified as to his good character and the value of his life to the community. After deliberating, the jury found aggravating circumstances and determined that the aggravating circumstances outweighed the mitigating circumstances offered by Evans. The Defendant was sentenced by the jury to death by electrocution.

■■■ When the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational tri-

er of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see* Tenn.R.App.P. 13(e). A jury verdict approved by the trial judge credits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown,* 551 S.W.2d 329, 331 (Tenn.1977).

■ In determining the sufficiency of the evidence, this Court is not permitted to re-weigh or re-evaluate the evidence. *State v. Cabbage,* supra, 571 S.W.2d at 836. Nor may this Court substitute its inferences for those drawn from the evidence by the trier of fact. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

The Defendant argues that he was convicted solely on circumstantial evidence and that the State did not introduce any direct evidence to connect him with this offense. However, a conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *State v. Williams,* 657 S.W.2d 405 (Tenn. 1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Crawford,* 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971). The testimony credited by the jury in this case clearly establishes the Defendant's presence near the By–Low Market at the approximate time of the mur-

der. Although the Defendant correctly asserts that mere presence at the scene of the crime is not sufficient to prove guilt beyond a reasonable doubt, other evidence adduced at trial, and cited at length above, clearly connects Evans to the murder of Mary Slover and is sufficient to support any rational trier of fact in finding the Defendant guilty of first degree murder beyond a reasonable doubt. Tenn.R.App.P. 13(e). The Defendant's challenge to the sufficiency of the evidence is without merit.

In a related issue, the Defendant avers that the trial court erred in overruling his motion for acquittal at the conclusion of the State's proof. The Defendant argues that when the evidence is insufficient as a matter of law, the trial court must direct a verdict of acquittal. However, since we hold there is sufficient evidence to support a verdict of guilty, the trial court did not err in overruling the Defendant's motion for judgment of acquittal. *See Farmer v. State,* 574 S.W.2d 49, 51 (Tenn.Crim.App. 1978).

## II.

### ALLEGED PRETRIAL ISSUES

#### A. Change of Venue

The Defendant contends that the trial court erred in denying his motion for a change of venue. He avers that murder is an atrocious and heinous crime wherever committed, but it is made even more so when a black male defendant allegedly kills a white female in a predominately white community. He alleges that to try him in Hamblen County violates his right to a fair trial by an impartial jury, which is guaranteed to the Defendant by the Sixth and Fourteenth Amendments of the United States Constitution, as well as Article I, Sections 8 and 9, of the Constitution of the State of Tennessee.

■ The decision of whether to change venue rests within the sound discretion of the trial court, and this decision will not be reversed on appeal absent a clear abuse of that discretion. *State v. Melson,* 638 S.W.2d 342, 360 (Tenn.1982), *cert. denied,*

459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). The Defendant has not established such abuse here. The record does not reveal that this case was given extensive media coverage or publicity in Hamblen County. In order to reverse a conviction for improper denial of a motion to change venue, defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him. *State v. Burton*, 751 S.W.2d 440 (Tenn.Crim.App.1988). Selection of the jury did not reveal extensive prejudice regarding the case. The few prospective jurors who had formed an opinion as to Evans's guilt or innocence were properly excused for cause. Although most of the potential jurors admitted they had heard or read reports of the murder, each actual juror stated unequivocally that he or she had not prejudged the case and would render a verdict based only upon evidence adduced at trial. Because the Defendant has failed to demonstrate that the actual jury was prejudiced, the issue is without merit.

#### B. Investigator Paid by the State

■ The Defendant next avers that the trial court erred in denying his motion for an investigator paid by the State as permitted under T.C.A. § 40–14–207(b). Particularly, the Defendant argues that the trial court should have granted his motion for appointment of an investigator to assist defense counsel in interviewing witnesses listed on the State's witness list.

> T.C.A. § 40–14–207(b) provides, in part:
> (b) In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an *ex parte* hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

This statute provides that it is in the trial court's discretion as to whether investigative services are necessary to protect the constitutional rights of the defendant. *State v. O'Guinn*, 709 S.W.2d 561, 568

(Tenn.1986), *cert. denied*, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).

The courts have uniformly held that the right to assistance of state paid experts exists only upon a showing of a particularized need. The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance. The Defendant did not request such an investigator until six days before the scheduled start of the trial. Moreover, as conveyed to the trial judge, defense counsel had the names of all potential witnesses at least five weeks before trial, and many of the potential witnesses were listed on the indictment returned six months prior to trial. The trial court ruled:

> Of course I don't want to put any undue hardship on counsel but you have one retained counsel and two appointed counsels ... with three lawyers and the period of time you should be able to talk to all witnesses. I don't find there's such unusual circumstances are ... are showing of need for appointment of an investigator. I ... I certainly in the capital cases especially would appoint any aide or expert that I feel is ... is needed to give fair representation of the defendant. But I don't feel that that's necessary in this case.

The Defendant has made no showing that without the assistance of an investigator he was, in fact, unable to adequately interview potential witnesses. This issue is without merit.

#### C. Venire Composition

The Defendant challenges the venire composition under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Article I, Sections 8, 9, and 16 of the Tennessee Constitution. He alleges that the trial court erred by failing to verify that blacks were proportionately represented in the jury venire and by failing to grant his motion to dismiss the indictment based upon that alleged underrepresentation.

In order to establish, in the context of jury selection, a *prima facie* case of purposeful discrimination under the Fourteenth Amendment, the Defendant must show that (1) he is a member of an excluded, recognizably distinct class; (2) the class to which the Defendant belongs has been underrepresented on venires for a significant period of time; and (3) the selection procedure is susceptible to abuse. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (addressing claim of underrepresentation on grand jury). To establish that the venire violates the Sixth Amendment's right to a jury representing a fair cross-section of the community, a defendant must establish that (1) the excluded group is a "distinctive group" in the community; (2) representation of the group in the jury pool is not fair and reasonable in relation to the number of group members in the community; and (3) underrepresentation of the group is due to systematic exclusion in the jury selection process. *See Duren v. Missouri,* 439 U.S. 357, 364–66, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979); *see also State v. Thompson,* 768 S.W.2d 239, 246 (Tenn. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990).

The Defendant has failed to establish a *prima facie* case under either the Fourteenth or Sixth Amendment. Evans introduced no evidence concerning the percentage of blacks in Hamblen county, the percentage of blacks on other venires, the potential for abuse of the selection procedure, or the systematic exclusion of blacks in the jury selection process. The record in this case reveals that the jury panel consisted of 77 individuals, four of whom (5.19 percent) were black. Because blacks constitute only 4.77 percent of the total Hamblen County population, the venire actually had a greater representation of black citizens than the county as a whole. Even though none of the four black members of the venire were selected to sit on the Defendant's jury, such a fact does not establish a constitutional violation in this case. Both defense counsel and the prosecution admitted during the hearing on Evans's motion for a new trial that all four black potential jurors were excused by the court either because they could not consider imposition of the death penalty or because they would never convict solely on circumstantial evidence.

The percentage of blacks on the venire in this case exceeded the percentage of blacks in the Hamblen County population. Moreover, none of the black individuals on the venire were removed from the panel by the prosecution. Rather, all four were properly excused for cause by the court. Given these facts and the failure of the Defendant to otherwise establish a *prima facie* violation of either the state or federal constitution in the selection process, the trial court did not err in failing to verify that blacks were proportionately represented on the venire. Furthermore, the trial court did not err in denying Evans's motion to dismiss the indictment based upon the racial composition of the jury.

### III.

### ALLEGED ERRORS AT TRIAL

#### A. Photographs

The Defendant next contends that the trial court erred in overruling his motion to suppress certain photographs. He avers that the photographs were highly prejudicial and inflammatory, thereby depriving him of his fundamental constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 8, 9, and 16, of the Tennessee Constitution.

Generally, "the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion." *Cagle v. State,* 507 S.W.2d 121, 132 (Tenn.Crim.App.1973). The trial court's ruling will not be overturned on appeal except upon a clear showing of abuse of that discretion. *State v. Harbison,* 704 S.W.2d 314, 317 (Tenn.1986); *State v. Banks,* 564 S.W.2d 947, 949 (Tenn. 1978). If the probative value of any photograph outweighs its prejudicial effects, the photograph is admissible. *See Banks,* 564 S.W.2d at 951.

■ In the present case, the photographs of the victim were in black and white and were not gruesome or inflammatory. Moreover, these photographs were relevant to show the body's position and location within the market and the proximity of the body to the market's safe.

In *State v. Banks, supra,* this Court approved Federal Rules of Evidence 401 and 403 to be followed by our courts as a proper guide in both criminal and civil cases. Effective January 1, 1990, this Court adopted the Tennessee Rules of Evidence, which trace Federal Rules 401 and 403 verbatim. Rule 401 defines relevant evidence as that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 403 provides that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *State v. Bates,* 804 S.W.2d 868, 878–79 (Tenn. 1991).

We find that the probative value of the photographs is not substantially outweighed by unfair prejudice as required for exclusion under Tennessee Rule of Evidence 403, and, therefore, that the trial court did not abuse its discretion in allowing their admission. Additionally, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." Tenn.R.Crim.P. 52; *see also, United States v. Brady,* 595 F.2d 359, 361 (6th Cir. (construing Fed.R.Evid. 403), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

### B.  Testimony of Johnny Bussell

■ The Defendant contends that the trial court erred in admitting into evidence the testimony of seven-year-old Johnny Bussell. Evans contends that the child did not appreciate the sanctity of the oath and the necessity to testify truthfully.

■ When a witness is under the age of 14 years, a rebuttable presumption arises that the child is not competent to testify. *State v. Francis,* 669 S.W.2d 85, 90 (Tenn. 1984); *State v. Fears,* 659 S.W.2d 370, 375 (Tenn.Crim.App.1983), *cert. denied,* 465 U.S. 1082, 104 S.Ct. 1450, 79 L.Ed.2d 768 (1984). The presumption may be rebutted, however, by evidence "that the witness possesses the requisite testimonial capacities and understands the nature and obligation of the oath." *Francis,* 669 S.W.2d at 90.

The determination of the competency of witnesses to testify is vested in the trial court's discretion. *State v. Robinson,* 618 S.W.2d 754, 756 (Tenn.Crim.App.1981); *State v. Nelson,* 603 S.W.2d 158, 168 (Tenn. Crim.App.1980). In this case, the trial court questioned Johnny Bussell prior to his testimony to determine whether he understood the necessity to tell the truth under oath. From the results of the questioning, the trial judge determined that Johnny Bussell understood both the nature and obligation of the oath. We conclude that the witness demonstrated that he was competent to testify; it follows that the trial court did not abuse its discretion in denying the Defendant's motion to prohibit his testimony.

### C.  Reprimand of Defendant

■ The Defendant next alleges that the trial court erred in reprimanding him during the sentencing hearing. During the sentencing hearing, the following colloquy took place between the Defendant, Defendant's counsel, and the trial judge:

DEFENDANT'S COUNSEL: "Mr. Evans, do you have ... do you have anything that you would like to say to this jury?"

DEFENDANT: "The only thing I can say and say in all honesty is that I did not kill Mary Slover. I had nothing to do with it but you have decided. *That's something I guess now you'll have to live with....*"

THE COURT: "... I'll say one thing. I won't permit any criticism of the jury.

Say anything you want to say but I won't permit any criticism of the jury." [Emphasis added.]

The trial court may have concluded that Defendant's comment impugning the jury verdict was improper and also that criticism of the jury was not in Defendant's best interest. The Defendant's life was in the hands of the jury; further remarks criticizing the jury could have been damaging to Defendant's case. We find no error committed by the trial court by insuring that such comments were not repeated.

### D. Interruption of Closing Argument

■ The Defendant next avers that the trial court erred in twice interrupting defense counsel's closing argument. The trial commenced at 9:00 a.m. The trial judge interrupted counsel's argument between 10:30 and 10:45 in order to take a ten minute recess and later interrupted counsel again to ask how much longer his argument would take. The court had earlier ruled that since this was a capital case, there would be no limitation on closing argument. The Defendant argued for one hour and 20 minutes. It is the duty of all trial judges to see that the proceedings before them move along in an orderly and systematical manner. The law is well settled that the trial judge has discretion in the conduct of a trial. *Pique v. State*, 480 S.W.2d 546, 550 (Tenn.Crim.App.1971). The interruption of lengthy closing arguments to take a short recess or bathroom break will not, without evidence to the contrary, prejudice a defendant's case. Moreover, the Defendant made no objection to the recess being taken at that time.

During oral argument before this Court, the Chief Justice asked counsel for Defendant whether these two incidents were the only occasions when the court arguably indicated any lack of patience with defense counsel or the Defendant. Counsel responded by stating that this was a six-day trial and these were the only two incidents. Counsel further stated: "There were certain motions or judgments that were rendered by the court that when they were borderline I felt that he did give in ... let

the scales weigh heavier for Defendant and rule in his favor." Counsel in Defendant's brief states that "it is essential that a criminal trial be managed fairly and that trial judges shall not only be just to both sides, but that they observe in their judicial demeanor an even tenor, so that an impartial state of mind shall be apparent to all concerned." We agree with counsel's statement, and our reading of this record shows that the trial was conducted in an even-handed manner. Moreover, counsel's comment during oral argument before this Court indicates that the trial judge reflected an impartial state of mind apparent to all concerned. We find this issue to be without merit.

### E. Alleged Prosecutorial Misconduct

■ The Defendant next avers that the State committed prosecutorial misconduct by failing to disclose mitigating information discovered during their investigation. Counsel for Defendant, during oral argument, stated that during a trial recess when the jury was out deliberating, counsel talked to one of the investigating police officers, who mentioned that Defendant might have been locked in a woodshed as a child. It is alleged that this evidence of child abuse was withheld by the State. Counsel also stated during oral argument that he was unaware that this information was in the State's file. At the hearing on Defendant's motion for a new trial, the Assistant District Attorney stated that he was familiar with the State's file and had not learned until that day that the Defendant was contending he was abused as a child. The record indicates that the State gave Defendant's counsel open access to its file and that Defendant's counsel had ample opportunity to talk with the detectives in this case. The State argues that the Defendant himself certainly had knowledge of his own childhood and thus was in actual possession of the allegedly mitigating evidence. However, counsel for Defendant stated that when he asked Evans about this, Evans denied ever being locked up in a woodshed as a child.

■ In order to prove a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Defendant must establish that the prosecutor suppressed discoverable information, that such information was of a favorable character for the defense, and that the suppressed information was material. *Strouth v. State*, 755 S.W.2d 819 (Tenn.Crim.App. 1986). We find no evidence in this record to support a *Brady* violation. The record fails to reflect that the State suppressed child abuse information from the Defendant. Having found no prosecutorial misconduct, this issue has no merit.

## IV.

### CONSTITUTIONALITY OF THE DEATH PENALTY

■ Defendant concludes by stating that imposition of death is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and Article I, Section 16 of the Tennessee Constitution, that the trial court erred in overruling his motion to dismiss the indictment on the grounds that the death penalty is unconstitutional; that death by electrocution is cruel and unusual punishment; and that the State's reluctance to carry out the penalty and the finality and severity of the punishment constitute cruel and unusual punishment. The Defendant further contends that the death penalty should be abolished. These issues were discussed at length in the majority and dissenting opinions in *State v. Black*, 815 S.W.2d 166 (Tenn.1991). There, a majority of this Court upheld the constitutionality of the Tennessee Death Penalty Statute.

■ The Defendant further contends that the death penalty is arbitrarily and capriciously applied in Tennessee and that he was discriminated against because of his race and, thus, was denied due process. In order to establish that the discriminatory application of the death penalty violates the Equal Protection Clause, a defendant must show that the legislature enacting the statute, or the jury sentencing the defendant, acted with a discriminatory intent. *State v. Irick*, 762 S.W.2d 121, 129 (Tenn.1988),

*cert. denied*, 489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825 (1989); *State v. Porterfield*, 746 S.W.2d 441, 451–52 (Tenn.1988), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The record does not support the Defendant's contention that the jury discriminated against him when they imposed the death penalty. Nor does the record indicate that the Tennessee Legislature acted with a discriminatory purpose when it enacted the Death Penalty Statute.

## V.

### CONCLUSION

#### A.

All members of this Court find no error in the guilt phase of this case and we affirm the conviction of felony murder.

#### B.

■ Three members of this Court find that the death penalty may constitutionally be imposed upon conviction under the felony-murder statute, T.C.A. § 39–2–202(a) (1982). *See State v. Middlebrooks*, 840 S.W.2d 317 (1992) (Chief Justice Reid and Justice Daughtrey dissenting).

#### C.

■ Three members of this Court hold that the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(7) (1982), that the Defendant was engaged in committing a felony, essentially duplicates the elements of the offense of first-degree murder set out in T.C.A. § 39–2–202(a) (1982). *See State v. Middlebrooks, supra* (Justices Drowota and O'Brien dissenting).

The judgment of conviction is affirmed, the sentence of death is reversed and set aside and this cause is remanded to the trial court for further appropriate proceedings. As author of this opinion, I disagree with the results reached insofar as sentencing is concerned and continue to adhere to the views expressed in my dissenting opin-

ion in *State v. Middlebrooks, supra.* I would affirm the judgment both as to the Defendant's guilt and his sentence of death and am authorized to state that Justice O'Brien would do the same. Costs incident to this appeal are adjudged against the Appellee.

REID, C.J., and DAUGHTREY and ANDERSON, JJ., concur.

DROWOTA and O'BRIEN, JJ., dissent from sentencing.