# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE SESSION, 1999



**FILED**

**July 19, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | **)** | **C.C.A. NO. 02C01-9810-CC-00330** |
| | **)** | |
| Appellee, | **)** | |
| | **)** | |
| | **)** | **OBION COUNTY** |
| **VS.** | **)** | |
| | **)** | **HON. WILLIAM B. ACREE** |
| **FREDERICK BOYD ALLEN,** | **)** | **JUDGE** |
| | **)** | |
| Appellant. | **)** | (Reckless Aggravated Assault) |

## ON APPEAL FROM THE JUDGMENT OF THE CIRCUIT COURT OF OBION COUNTY

FOR THE APPELLANT:

CLIFFORD K. McGOWN, JR.
On Appeal
113 North Court Square
Waverly, TN 37185

JOSEPH P. ATNIP
District Public Defender

COLIN JOHNSON
Assistant Public Defender
Dresden, TN 38225

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General and Reporter

R. STEPHEN JOBE
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

THOMAS A. THOMAS
District Attorney General

JIM CANNON
Assistant District Attorney General
P.O. Box 218
Union City, TN 38261

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# <u>OPINION</u>

The Defendant, Frederick Boyd Allen, was indicted on a single count of aggravated assault by use of a deadly weapon. On August 18, 1998, he was tried before an Obion County jury and found guilty of the lesser included offense of reckless aggravated assault by use of a deadly weapon. He was sentenced as a Range I standard offender to three years in confinement, with his sentence to run concurrently with a sentence he was then serving from a conviction in General Sessions Court. Pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure, the Defendant now appeals his conviction and his sentence. He presents two issues for our review: (1) whether the evidence presented at trial is sufficient to support his conviction; and (2) whether the trial court properly sentenced the Defendant to three years in confinement, rather than imposing an alternative sentence involving split confinement. We affirm the judgment of the trial court.

## EVIDENCE PRESENTED AT TRIAL

The victim in this case, Amanda Hartsfield, a resident of Paducah, Kentucky, testified that she was visiting her grandmother in South Fulton, Tennessee with her two young children when the incident underlying the Defendant's conviction occurred. She testified that she had known the Defendant since childhood and that they had been friends for some time. The victim recalled that she was cooking a meal for her children, her grandmother, and herself shortly before midnight on the evening of March 27, 1988 when she heard a knock at the kitchen door. She answered the knock and discovered the

Defendant standing outside. She invited him into the house, and they conversed normally for a while. During the conversation, the Defendant noticed a box of cigars on the table and left the kitchen to ask the victim's grandmother, Mattie Garmon, if he could have a cigar.

The victim testified that the Defendant returned three to five minutes later and started "talking very crazy about killing people and stuff . . . and just basically about bringing harm to people." The victim stated that although she "didn't really feel like [she] was at harm," she began to feel uneasy. She asked the Defendant to leave, and when he refused, she called her grandmother "to come and remove him." The victim maintained that as her grandmother came running down the hall to the kitchen, the Defendant grabbed the knife that the victim had been using while cooking. She began to wrestle with the Defendant for the knife, holding onto his arm with both hands. She recalled that she had to kick her infant son, who was at her feet on the kitchen floor, out of the way to prevent harm to him. The victim claimed that during the struggle, the Defendant "was talking about he could kill [her] because he's hurt people before when he was in California, . . . he was brought up that way in California and don't nobody know what he is or what he's capable of."

At some point during the struggle, Garmon arrived in the kitchen and began to beg the Defendant to put the knife down. According to the victim, Garmon realized that the Defendant would not comply and therefore started trying to wrest the knife out of his hand. The victim stated that the Defendant eventually "eased up off the knife," and she was able to take it from his hand.

When the knife fell to the floor, the victim kicked it behind the garbage can. The Defendant then turned and left the home "like nothing happened."

After the Defendant departed, the victim realized that she had received a cut to the palm of her left hand. She stated that the wound "probably needed stitches" but stated that she tended the cut herself. The victim maintained that she did not recall how or when she was cut. On cross-examination, she admitted that she may have received the wound by grabbing the blade of the knife while trying to recover it from the Defendant's hand. She also testified that she was not actually afraid of the Defendant until he grabbed the knife.

Garmon testified that she was in her bedroom when the Defendant arrived at her home. She stated that she heard him knock and enter the house, and then she heard the Defendant and the victim conversing and laughing. She next heard the Defendant come down the hall toward her bedroom and stop to use the bathroom located next to her bedroom. According to Garmon, the Defendant then went back to the kitchen, and she heard the victim calling for her to "put Frederick out." She jumped up and ran to the kitchen, where she saw the Defendant holding "a knife up over [the victim's] head, and they both was [sic] wrestling with the knife at the same time." Garmon ran to the Defendant, grabbed his arm, and began to beg him not to hurt her granddaughter. According to Garmon, the Defendant responded, "I'm gonna kill her."

While she was still holding the Defendant's arm, the victim managed to take the knife out of the Defendant's hand and kick it behind the garbage can. Garmon testified that the Defendant then began walking to the door, all the while

-4-

telling the victim, "I will get you. . . . I'm gonna get you. . . . I dare you to come out in the street." Garmon told him to stop threatening the victim and threatened to call the police. Garmon testified that when the Defendant left, he got into his truck, backed very quickly out of the driveway, went up the street to get "a start," and then drove back. However, on the way back toward the house, he apparently lost control of his truck and drove into a ditch. Garmon then called the police.

Officer Ben Duncan of the South Fulton Police Department answered the call. He testified that he was dispatched to an accident and observed the Defendant's truck in a creek near Garmon's home when he arrived. He stated that no one was in the truck when he arrived. Duncan also testified that he spoke with both the victim and Garmon and said that their testimony in court mirrored what they had told him on the night of the incident. He described the victim as "very upset and scared" when he arrived at Garmon's home and testified that he noted the cut on her left palm. He also collected a knife, which he found on the kitchen floor. In addition, Duncan reported that he and two other officers present at the scene "heard a scuffle of someone getting into a fight down the street about two doors down . . . , and it was [the Defendant]," whom they then took into custody.

The Defendant presented a different version of the events that occurred on the night of March 27, 1998 and during the early morning hours of March 28, 1998. He testified that he stopped by Garmon's house that evening and knocked on the door. He stated that the victim answered the door, invited him in, and they began to converse while she cooked. He testified that he noticed a pack of

-5-

cigars on the kitchen table and went to ask Garmon if he could have one. However, he claimed that as he headed to Garmon's room, he changed his mind, deciding that he did not want a cigar, and went back to the kitchen instead. He denied stopping at Garmon's bathroom.

The Defendant maintained that when he arrived back at the kitchen, "things seemed to go haywire." He claimed that he and the victim got into an argument about something "stupid," although he could not recall precisely why they were arguing. He testified that the victim then asked him to leave. He responded that he did not have to leave because it was her grandmother's house. He stated that the second time the victim told him to leave, she grabbed a knife from the table, held it in her raised hand, pointed it toward him, and approached him. He reported that he did not believe that he could back away from her, so he grabbed her by the wrist to defend himself. He testified that they struggled for the knife in the presence of Garmon. He claimed that the victim cut herself when she attempted to transfer the knife from her right hand to her left hand. He reported that when she cut herself, she dropped the knife. According to the Defendant, when the victim dropped the knife, he backed away and left the house.

The Defendant maintained that he never held the knife in his hand, that he never threatened the victim, and that he never had any intention of hurting the victim. He stated, "I'm sorry that it ever happened . . . but, you know, it wasn't my fault." The Defendant explained that when he left the house, he was angry and upset and therefore drove too fast. He also explained that when he backed out of the driveway, he was unable to turn his truck around, so he had to drive up the street to reverse directions and then drive back by Garmon's home. He claimed

that because it was dark and he was driving fast, he couldn't "get the truck to turn and it locked up." This caused him to drive into the creek. On cross-examination, the Defendant admitted that he had pleaded guilty to the crime of burglary in 1996.

SENTENCING HEARING

At the sentencing hearing, Dale Green of the Tennessee Department of Corrections testified about the Defendant's prior criminal record. He stated that he had filed the presentence report in this case. Green reported that the Defendant had been previously convicted of burglary and second degree burglary in California, both in 1996. The presentence report indicates that the second degree burglary offense is a felony in California but was treated as a misdemeanor for sentencing purposes. The report also indicates that "there is no question Defendant was still on probation when the instant offense occurred." Furthermore, Green reported that the Defendant had also been convicted of both assault, in 1998, and harassment, in 1997, in the Obion County General Sessions Court.

Derrick Hayes, a lifelong friend and former coworker of the Defendant, testified that the Defendant is a truthful and nonviolent person. However, Hayes admitted on cross-examination that he was unaware the Defendant had been recently convicted of assault against Defendant's father.

The Defendant testified on his own behalf at the sentencing hearing. He testified that he was presently incarcerated for ninety days in the Obion County jail for assault against his father. He explained that he and his father "had an

altercation." The Defendant also testified that he had been employed prior to his incarceration and that he had always tried to maintain steady employment. He claimed that he had abided by the terms of his probation for his California conviction and had never been brought into court for a violation of his probation.

The Defendant further testified that he had advised his probation officer of his move to Tennessee. However, on cross-examination, he conceded that although he was required to report to his probation officer any new criminal charges, convictions, or arrests, he had not reported this conviction as of the time of sentencing. He blamed his failure to do so on losing the probation officer's business card. With regard to his altercation with the victim, he stated he "regret[ted] that it ever happened."

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence presented at trial is insufficient to support his conviction. Although the Defendant was charged with aggravated assault, a Class C felony, see Tenn. Code Ann. § 39-13-102(a)(1)(B), (d), he was convicted of the lesser included offense of reckless aggravated assault by use of a deadly weapon, a Class D felony. See Tenn. Code Ann. § 39-13-102(a)(2), (d). In order to support the Defendant's conviction for reckless aggravated assault, the State must have proven that the Defendant recklessly caused bodily injury to the victim by use of a deadly weapon. See Tenn. Code Ann. § 39-13-101(a)(2)(B). "Bodily injury" includes a cut. Tenn. Code Ann. § 39-11-106(a)(2).

-8-

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

In this case, the State presented the testimony of two witnesses, the victim and her grandmother, indicating that the Defendant picked up a knife and threatened the victim with it. According to both the victim and her grandmother, the victim entered into a struggle, later accompanied by her grandmother, with the Defendant for possession of the knife. The victim testified that she grappled

for the knife in order to protect herself and her child, and that during the struggle, she was cut. This is clearly sufficient evidence from which a jury could conclude that the Defendant was guilty of reckless aggravated assault by a use of deadly weapon.

Testimony by the Defendant indicating that he did not initiate the struggle, threaten the victim, or actually hold the knife was also presented to the jury, and apparently, the jury dismissed the Defendant's testimony as dubious. We will not disturb this conclusion on appeal. Viewing the evidence in the light most favorable to the State, we conclude that the evidence presented at trial is sufficient to support the Defendant's conviction.

## II. SENTENCING

The Defendant next argues that his sentence of three years as a Range I standard offender is improper and that the trial court erred by denying him alternative sentencing in the form of split confinement. He contends that the use of "shock incarceration" followed by "intensive probation" would have been a more appropriate disposition of this case.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a <u>de novo</u> review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant concedes, and we agree, that the trial judge in this case conducted on the record a thorough review of the facts and circumstances of the case, an analysis of the enhancement and mitigating factors, and a review of the principles of sentencing, thereby fulfilling his role in the sentencing process. Our standard of review is thus de novo with a presumption of correctness.

The trial judge noted that the Defendant, as a standard offender convicted of a Class D felony, was presumed a favorable candidate for alternative sentencing in absence of evidence to the contrary. See Tenn. Code Ann. § 40-

35-102(5), (6). However, the trial judge also noted the sentencing considerations codified at Tennessee Code Annotated § 40-35-103 and concluded that "the State . . . proved [two of] these considerations. Number 1(A), confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; and also 1(C), measures less restrictive than confinement have been applied unsuccessfully to the defendant." See Tenn. Code Ann. § 40-35-103(1)(A), (C). In support of his conclusion, the judge pointed to the Defendant's four previous convictions, all of which had occurred over the two years previous to sentencing and two of which were crimes similar to this crime, assault and harassment.[1]

In considering the Defendant's suitability for full probation, the trial judge emphasized that in order to warrant such a sentence, a defendant must demonstrate that full probation will serve the ends of justice in the best interest of both the public and the Defendant. The judge first considered the nature of the crime, which he characterized as "an unprovoked attack upon the victim, a female, by the use of a knife." The judge also emphasized that the Defendant had previously received probation for prior convictions and stated that "the Court would look to the prior efforts at rehabilitation . . . , and that has not worked." Therefore, the judge concluded that the Defendant was not a proper candidate for alternative sentencing and not entitled to probation.

Finally, after consideration of enhancement and mitigating factors, the trial judge applied one enhancement factor, "[t]he defendant has a previous history

---

[1]     The Defendant was only twenty-one years old at the time of sentencing.

of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1). The judge denied application of all mitigating factors suggested by the defense. Therefore, applying one enhancement factor, the judge increased the presumptive sentence for the Defendant's crime by one year, thus establishing a three year sentence.

The trial court conducted an exemplary review of the facts and circumstances of the case and consideration of the principles of sentencing. Based upon our thorough review of the record and careful consideration of the findings of the trial court, we conclude that the Defendant has failed to demonstrate that the sentence he received is improper. We therefore affirm the sentence imposed.

The judgment of the trial court is accordingly affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
THOMAS T. WOODALL, JUDGE

_____
NORMA McGEE OGLE, JUDGE