# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 20, 2001

## STATE OF TENNESSEE v. JOSEPH VELLA

### Appeal from the Criminal Court for Knox County
### No. 65143A     Mary Beth Leibowitz, Judge

---

### No. E2000-01149-CCA-R3-CD
### March 12, 2001

---

The Defendant, Joseph Vella, appeals as of right from his criminal trespass conviction. He asserts that the evidence presented at trial was insufficient to support his conviction. We disagree; accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Mark Stephens, Knox County Public Defender, Knoxville, Tennessee; Bob Edwards, Assistant Public Defender, Knoxville, Tennessee, for the appellant, Joseph Vella.

Paul G. Summers, Attorney General and Reporter; Patricia Kussman, Assistant Attorney General; Randall E. Nichols, District Attorney General; Patti Cristil and Jennifer Welch, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant and his nephew, Gary Vella, were tried jointly before the Honorable Mary Beth Leibowitz in a bench trial in Knox County. The Defendant was found guilty of criminal trespass, a Class C misdemeanor, and Gary Vella was found guilty of assault, a Class A misdemeanor. The Defendant was sentenced to ten days in the Knox County jail, which was suspended upon payment of costs. Gary Vella was permitted to apply for judicial diversion. In this appeal as of right, the Defendant asserts that the evidence was insufficient to support his conviction.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia,

443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

At trial, Ronald Dean Sandifer testified that he was the chief of security for the Electric Ballroom on June 29, 1997. The Electric Ballroom is a bar in Knox County which features live entertainment. On the night in question, the Electric Ballroom was presenting a female impersonator floor show. Mr. Sandifer testified that his job was to deal with security problems that other employees could not handle. He had the authority to ask people to leave the bar. He identified the Defendant and Gary Vella as patrons who came into the bar together on June 29, 1997, around the time the bar opened, which was 9:00 p.m. Around 11:30 that evening, it was brought to his attention that the Defendant had been making remarks about the entertainers and had shoved one of them. He approached the Defendant and Gary Vella and asked them to come to the front of the bar where he could talk to them. At first they were unresponsive, but then they began to follow him.

Mr. Sandifer testified that he walked in front, followed by the Defendant and Gary Vella, who in turn were followed by two other security guards. When they were almost to the front of the bar, the procession stopped, and Mr. Sandifer turned around. At this point, Gary Vella assaulted him. Mr. Sandifer said that Gary Vella knocked him to the ground, straddled him, and started hitting him about the head and chest. One of the other guards assisted Mr. Sandifer, and they restrained Gary Vella until the police arrived. Mr. Sandifer stated that during this assault, one of the other guards escorted the Defendant out the door, but the Defendant kept coming back inside, "screaming and hollering," and he attempted once to free his nephew. Mr. Sandifer said that the Defendant was asked to leave by himself and by the other guards, but he came back into the bar approximately three times after being told to leave and being escorted out.

The Defendant testified that on the night in question, he was with a group of seven people, including his nephew, Gary Vella. They had dinner at O'Charley's Restaurant on Kingston Pike and arrived at the Electric Ballroom at approximately 11:00 p.m. When they arrived, they paid the cover

charge, bought drinks, and moved to the stage to watch the show. The Defendant said that when the show began, a performer attempted to solicit money from him, and he asked the performer to please not touch him and to move away. The performer said something impolite and then moved away. At one point, a security guard, or "bouncer," approached the Defendant and asked him to step off the dance floor, which he did. Shortly, the performer was in the center of the stage when a patron started "crawling" out from the crowd to tip the performer, and the Defendant stepped onto the dance floor to see what was happening. The show ended, and the performer "shot [the Defendant] a bird." The Defendant responded in kind.

The Defendant testified that two bouncers approached him at this point and asked him to follow them up to the front of the bar to talk. The Defendant asked his nephew and another friend to accompany him, which they did. When they were about ten feet from the front, the Defendant stopped. The bouncers told him that he needed to leave the club. When he asked, "why," they responded that it was because he would not get off the dance floor. The Defendant said that the bouncers would not let him get his friends, and when he tried to find out why, he was pushed into a wall. Then, Gary Vella came to his defense. The Defendant testified that he was "dragged out" of the club and "thrown out on the cement outside." He said that he tried to go back inside two or three times because he saw his nephew being handcuffed, but he was not allowed to reenter. The Defendant suffered broken ribs, a broken wrist, and scratches to his face from the altercation.

Michael Scott Trail testified that he had known the Defendant and Gary Vella for three and a half years, and he accompanied them to O'Charley's and to the Electric Ballroom, along with other friends. They arrived around 11:00 p.m. Mr. Trail did not witness any altercation between the Defendant and a performer. He testified that two bouncers approached their table, grabbed Gary Vella, and "started hauling him out." The Defendant then got up and went to find out what was happening. Mr. Trail said the bouncers then grabbed the Defendant and started "hauling him outside." He said that they threw the Defendant to the ground outside and handcuffed him, breaking his wrist. He did not see the Defendant try to reenter the building. He also maintained that he did not see Gary Vella strike anybody, but he did see a bouncer hit Gary in the head with a flashlight.

Gary Vella testified and confirmed the Defendant's statements regarding the interaction with the performer and being asked to step off the stage. Mr. Vella said that the bouncers asked the Defendant to come to front of the club, and he accompanied the Defendant. When they were close to the door, the Defendant stopped, and Mr. Vella turned around and started walking toward the Defendant. He said that he saw the Defendant being shoved into the wall, and he went to see what was happening. The bouncers then started shoving him, and he responded in self-defense. He testified that he was choked into unconsciousness and then handcuffed.

Sherril Sandifer testified in rebuttal that she was at the entrance to the club that night taking money at the door. She heard a commotion and saw Gary Vella on top of her husband, Ronald Sandifer, hitting him. The other security guards helped restrain Gary Vella. Ms. Sandifer said that she also saw the Defendant that night. She said that he was loud and obnoxious. She heard the security guards asking him to leave.

After hearing this proof, the trial court found the Defendant guilty of criminal trespass. The statute defining criminal trespass provides:

(a) A person commits criminal trespass who, knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof. Knowledge that the person did not have the owner's effective consent may be inferred where notice against entering or remaining is given by:

(1) Personal communication to the person by the owner or by someone with apparent authority to act for the owner;

. . .

(b) It is a defense to prosecution under this section that:

(1) The property was open to the public when the person entered and remained;

(2) The person's conduct did not substantially interfere with the owner's use of the property; and

(3) The person immediately left the premises upon request.

Tenn. Code Ann. § 39-14-405.

Looking at the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's conviction of criminal trespass. It is undisputed that the property was open to the public when the Defendant entered, but he was asked to leave by a person with the apparent authority to act for the owner. The trial court also specifically found that the Defendant's conduct on the dance floor did not substantially interfere with the owner's use of the property. The pivotal issue at trial and on appeal is whether the Defendant remained on the property after being informed that he no longer had the owner's effect consent to be there or whether he left immediately upon request. We conclude that the evidence is sufficient to support the trial court's conclusion that the Defendant remained on the property after being asked to leave. The proof established that Mr. Sandifer and the other security guards asked the Defendant to leave. The Defendant was escorted out, but according to Mr. Sandifer, he reentered the building three times, while yelling and screaming. According to the Defendant himself, he attempted to reenter the building two or three times. Thus, the Defendant did not leave the property immediately upon request.

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

-4-