IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2001

## STATE OF TENNESSEE v. JAMES SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 00-02772     W. Otis Higgs, Jr., Judge**

_____

**No. W2000-02315-CCA-R3-CD - Filed April 4, 2002**

_____

The defendant, James Smith, was convicted of one count of first degree murder. The trial court imposed a sentence of life imprisonment with the possibility of parole. In this appeal, the defendant argues (1) that the evidence was insufficient to support his conviction and (2) that the trial court erred by admitting certain photographs of the victim. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, James Smith.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; and Jerry Kitchen and Greg Gilluly, Assistant District Attorneys General, for the appellee, the State of Tennessee.

**OPINION**

At approximately 9:00 P.M. on July 21, 1999, Derrick Landford was walking in his neighborhood in Memphis when he encountered several people having an argument. According to Landford, Michael Jones, whom he knew as "Pepper," passed his handgun to another individual and then struck the victim, Steven Cooks. The two men then fought each other, "one on one," meaning that no weapons would be used, rolling down an embankment and onto a grassy area near the street curb.

By then, the defendant, who was driving a red, four-door Cutlass automobile, had arrived at the scene. According to Landford, the defendant parked his vehicle on the "wrong" side of the street and stepped quickly out of the car, leaving the driver's side door open. Eric Adams approached the defendant, who was carrying a black automatic weapon, and informed him that Pepper and the victim were fighting "one on one." The defendant responded by "slapping" Adams in the head with his

gun, causing Adams to fall to the ground. According to Landford, the defendant then approached from the back of the victim, who was on his knees. The defendant shot the victim, quickly returned to his car, and backed down the street with the headlights off.

Demario Holmes, the victim's cousin, also witnessed the shooting. On the day of the shooting, Demario Holmes, the victim, and some other cousins were walking through the neighborhood looking for the victim's bicycle, which had been stolen. Unable to find the bicycle, the group stopped at the In and Out Market, a grocery store located at the corner of Chelsea and Pearce streets, where they encountered Pepper, who was "talking bad stuff." At trial, Demario Holmes testified that Pepper hit the victim first and the two then "started tussling." He recalled that the defendant arrived soon after the altercation began and parked on the opposite side of the street. Demario Holmes saw the defendant step out of his car and strike a young man in the head with a gun. He remembered the defendant first shouting, "Get off my people, get off my nigga," and then shooting the victim one time. The victim responded by saying only, "He shot me."

Quenton Holmes, the victim's twelve-year-old cousin, provided essentially the same account as his older brother, Demario Holmes. He testified that Pepper was carrying a gun but passed it to another individual before striking the victim. Quenton Holmes also recalled that a young man who was watching the fight left the scene on a bicycle so as to notify the defendant of the altercation. Quenton Holmes remembered that the victim said, "I got shot," and that the victim then vomited blood.

The altercation began when Marco Lyles, who was on his way to the In and Out Market to buy some food, met Billy Irby. The two argued and Irby threatened "to get Pepper." Afterward, when Pepper approached Lyles and pointed a gun in his direction, the victim intervened, according to Lyles, attempting to ascertain the reason for the dispute. Pepper then struck the victim and the two began to fight "one on one." During the altercation, Lyles noticed a car "flying down" the street on his left. When the car came to a stop, the defendant stepped out of his car, leaving the door open and the engine running, and hit Eric Adams in the head with a gun. Lyles testified that the defendant then walked over to the victim, said "step off them," and shot the victim once in the back.

Kevin Dewalt, who was working at the In and Out Market on the day of the shooting, witnessed the fight. He testified that the defendant arrived at the scene, struck Eric Adams in the head, and then shot the victim in the back.

Beverly Bradshaw, whose daughter, Renata, is engaged to the defendant, testified that the defendant arrived at her house between 10:30 P.M. and 11:00 P.M on the night of the shooting and spent the night with her daughter. A Memphis police officer discovered the murder weapon hidden just over the fence from the Bradshaw residence.

Agent Shelly Betts of the Tennessee Bureau of Investigation examined the defendant's gun. She explained that the gun was a single action weapon, meaning that the gun had to be cocked before it would fire. Additionally, she testified that the safety had to be depressed completely before the

gun would fire. According to Betts, the gun required four and three-quarter pounds of pressure to fire.

Medical testimony established that the victim died as the result of a gunshot wound to the abdomen. The bullet entered the right side of the abdomen and pierced the stomach wall, the liver, the vena cava, and the aorta, lodging just above the victim's hip bone. According to Dr. O'Brien Cleary Smith, the bullet traveled downward, right to left, over a total distance of five inches. It was Dr. Smith's opinion that the bullet was fired from a distance of greater than two feet. Dr. Smith stated that the wound was consistent with the victim's being shot while on his knees, as contended by the state. He conceded that the wound was also consistent with the defense theory that the gun was fired accidentally as the defendant struck Eric Adams in a downward motion.

Billy Irby, as a defense witness, testified that on the day of the shooting Marco Lyles picked a fight with him, but before there was any exchange of blows, the victim arrived and baited Pepper into a fight. Irby claimed that Pepper had instructed the victim not to intervene in the fight and the victim responded by challenging Pepper to "get dirty." According to Irby, the victim then stepped into the street and Pepper struck him. Irby testified that he then rode Pepper's bicycle to the defendant's cousin's house, informed the defendant that some people were "jumping" Pepper, and watched the defendant speed away in his car. Irby then heard a gunshot and left.

Antwan Holmes, another defense witness, testified that when the victim challenged Pepper to a "one on one" fight, Pepper declined, explaining the Lyles/Irby dispute was none of their business. He claimed that when the defendant arrived in his car, some of those watching the fight approached the car saying, "It ain't your business, stay out of it." Antwan Holmes testified that he then heard a smack closely followed by a gunshot.

Michael "Pepper" Jones testified that on the day of the shooting, he was walking through the neighborhood when he saw Billy Irby being accosted by three young men. Jones, suspecting that the young men intended to "jump" Irby, stepped in to protect Irby. He claimed that the victim was the agitator in their fight. Jones contended that during their altercation, he saw an individual named "Gino," who was standing over him with his hand in his pants, directing the victim to move. Jones claimed that he thought Gino was going to shoot him. Just as the defendant arrived, Gino pulled out a chrome plated gun and pointed it at Jones. Jones then heard "pow!"

Zedrick Smith testified that he was with his brother, the defendant, at their aunt's house when Billy Irby arrived claiming that "some guys were jumping Pepper up the street." Smith stated that he and the defendant drove to the scene and upon their arrival, "a mob of guys rushed towards [them]." According to Smith, the defendant drew a gun and when he swung at a young man standing in front of him, the weapon discharged. Smith stated that the crowd then dispersed and that he left without realizing that anyone had been shot.

Eric Adams, testifying for the defense, recalled that on the day of the shooting he was at home when "his little associates" arrived and informed him that "some Vice Lords [were] trying to

jump on them." He claimed that there were forty or fifty Vice Lords at the scene. Adams stated that he spoke briefly with Pepper before the defendant arrived in a burgundy Cutlass. He testified that he ran toward the defendant explaining that the fight was "one on one" when the defendant struck him with a gun and said, "Get out of the way, bitch." Adams testified that he dropped to the ground because he was afraid the defendant was going to shoot him. While on the ground, he saw the defendant aim the gun at the victim and fire more than once. At trial, Adams testified that he did not give a statement to the police because he was hiding from police at the time of the shooting.

The defendant testified to essentially the same account as his brother, Zedrick Smith. He added that he was immediately confronted by Eric Adams when he arrived at the scene. When Adams warned him to "stay out of [his] folks' business," the defendant then pulled a Colt .45, which belonged to a friend, and struck Adams in the head. The defendant contended that the gun discharged accidentally when he struck Adams. He claimed that he did not know that the gun was loaded and contended that he could not see what was going on because he was not wearing his glasses. The defendant testified that he left quickly because he believed he had shot Adams. While acknowledging that he drove to Renata Bradshaw's house and spent the night there, he contended that he returned the gun to his friend and denied hiding it in the Bradshaw's backyard.

# I

Initially, the defendant challenges the sufficiency of the evidence. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder is defined as follows:

> (a) First degree murder is:
> (1) A premeditated and intentional killing of another;
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy; or
> (3) A killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a).

Here, the evidence presented by the state established that the defendant, upon being informed of an altercation involving the victim and one of his friends, drove to the scene. Upon his arrival, the defendant struck Eric Adams in the head with his gun and then shot the victim once in the back, causing his death. After the shooting, the defendant got into his car, backed away with his headlights turned off, and traveled to the residence of his girlfriend, where the murder weapon was later found by police. The defendant claimed that the gun accidentally discharged when he struck Adams. The jury rejected the defendant's theory, as was its prerogative, and accredited the witnesses for the state. In our view, the evidence was sufficient to support the defendant's conviction.

**II**

The defendant next contends that the trial court erred by admitting two photographs of the victim taken at the morgue. The admissibility of photographs is governed by Tennessee Rule of Evidence 403. See also State v. Banks, 564 S.W.2d 947 (Tenn. 1978). The evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. See generally State v. McCall, 698 S.W.2d 643 (Tenn. Crim. App. 1985). If other considerations substantially outweigh the probative value of the evidence, it should be excluded. In Banks, our supreme court recognized "the inherently prejudicial character of photographic depictions of a murder victim." 564 S.W.2d at 951. In adopting Federal Rule of Evidence 403 as the test for admissibility, our high court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors. Id.

Two photographs were admitted which depicted the nature of the injuries the victim suffered as a result of the gunshot wound. The first is a close up shot of the entrance wound. The second is a side view of the victim lying on his back in the morgue. While unpleasant, these photographs are not overly graphic. The photograph of the wound is probative of the distance between the defendant and the victim because it showed the absence of powder burns or stippling. The second photograph, which indicates both the location of the entrance wound and the location from which the bullet was removed, was utilized by Dr. Smith to established the downward path taken by the bullet.

The defendant asserted at trial that the photographs had no probative value because Dr. Smith had used a mannequin to explain the nature of the victim's injuries. The trial court ruled that the photographs were relevant and that their probative value was not outweighed by the danger of unfair

prejudice.  In our view, each of the photos was probative.  While somewhat prejudicial, the photographs were not overly so.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE