IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

## STATE OF TENNESSEE v. ROBERT GAMBLE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-07519,20,21     James C. Beasley, Jr., Judge**

---

**No. W1999-01016-CCA-R3-CD - Decided June 27, 2000**

---

The Defendant, Robert Gamble, was indicted for two counts of robbery, one count of the fraudulent use of a debit card, and one count of theft of property over $500. He was subsequently tried by a jury in Shelby County and found guilty of all charges. The trial court sentenced him as a career offender to an effective sentence of sixty-six years. In this appeal as of right, the Defendant argues that the evidence was insufficient to support his convictions and that he was improperly sentenced. We hold that the evidence presented at trial was sufficient to support the Defendant's convictions and that the Defendant was properly sentenced. Accordingly, we affirm the Defendant's convictions and his sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed.**

WELLES, J., delivered the opinion of the court, in which HAYES, J., and GLENN, J., joined.

A.C. Wharton, Public Defender, Memphis, Tennessee, Garland Erguden, Assistant Public Defender, Memphis, Tennessee, for the appellant, Robert Gamble.

Paul G. Summers, Attorney General and Reporter, Tara B. Hinkle, Assistant Attorney General, William L. Gibbons, District Attorney General, James M. Lammey, Assistant District Attorney General, for the appellee, State of Tennessee

## OPINION

In May 1997, the Shelby County Grand Jury indicted the Defendant, Robert Gamble, for two counts of aggravated robbery, one count of the fraudulent use of a debit card, and one count of theft of property over $500. A Shelby County jury found him guilty of all charges. After a sentencing hearing, the trial court sentenced the Defendant as a career offender to six years for the fraudulent use of a debit card, six years for theft of property, and thirty years for each count of aggravated robbery. The trial court ordered that the sentences for fraudulent use of a debit card and theft of property be served concurrently, but consecutive to the sentences for aggravated robbery. In

addition, the court ordered that the two sentences for aggravated robbery be served consecutively to each other. The Defendant therefore received an effective sentence of sixty-six years.

Pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure, the Defendant now appeals. He presents the following two issues for our review: (1) whether the evidence presented at trial was sufficient to support his convictions, and (2) whether his sentence is proper. We affirm the judgment of the trial court.

On January 10, 1997, two masked men entered a Union Planters Bank on Lamar Avenue in Memphis at approximately noon. Marpu Moulton, who was working as a teller at the "drive-thru" window of the bank, testified that she heard one of her co-workers say, "oh my God," and she turned to see one of the men, who was holding a handgun, jump onto the teller line counter. She testified that he told everyone to get on the floor, stating, "If you don't get on the floor, I [will] shoot you." Moulton stated that the man then grabbed her by the arm and "threw" her to the other side of the counter, where she laid on the floor. She reported that the man then rifled through her teller drawer and took her purse before leaving. Later that day, she discovered that approximately $500 had been removed from her bank account by way of her Automatic Teller Machine (ATM) card, which was in her purse at the time it was stolen.

Pamela Townsend, another employee of Union Planters Bank, testified that she was also working at the bank on the day of the robbery. She recalled that "two gentlemen enter[ed] the bank with guns, demanding, shouting obscene words that we all get on the floor." She testified that one of the men "was holding the desk side officials [on the floor] on one end of the bank" while the other man "jumped the counter and began getting money from the tellers." After the men left, they dropped a bag containing the stolen money outside the bank when a "dye pack" exploded inside the bag. Townsend explained that a dye pack is a bank security measure and described it as a fake stack of money with a detector hidden inside that releases red dye when transported through the bank door. Townsend testified that approximately $6,500 stained with red dye was retrieved from the bag abandoned by the robbers outside the bank. Townsend also introduced bank records showing activity on Moulton's ATM card following the robbery. She testified that Moulton's ATM card was used five times the day it was stolen and that the total amount taken from Moulton's account was $554.

Marquita Brownlee testified that she was using the ATM machine at the Union Planters Bank on January 10, 1997 at the time of the robbery. She recalled that when she put her card in the ATM machine, she heard a "commotion" behind her. When she turned around, she faced a man standing behind her holding a gun and a white bag, who said, "bitch, turn back around." She complied, and he then left. She testified that the man got into a white Chevrolet Camaro Iroc Z-28 with another person and drove away. Brownlee stated that although it was snowing on the day of the robbery and snow covered part of the car's license plate, she saw part of the tag number. She identified the license plate as a Tennessee tag containing the numbers 667.

Sergeant David Roleson of the Memphis Police Department testified that he was assigned to the Federal Bureau of Investigation (FBI) Safe Streets Task Force on January 10, 1997. He stated

that the task force was created to investigate bank robberies in Memphis and reported that he was assigned to investigate the robbery at issue in this case. During his investigation, Sergeant Roleson discovered three shoe prints on the bank counter. He had a crime scene officer photograph the prints and then "lift[ed]" the prints from the counter. He reported that the prints were wet because of the snow outside on the day of the robbery.

Gordon Neighbours, the senior fraud investigator for Union Planters Bank, stated that he was called to the Union Planters Bank on Lamar Avenue on January 10, 1997. He testified that the money recovered by the bank from the bag abandoned by the robbers was covered with red dye and tear gas. Neighbours also testified that he put a "block" on Moulton's ATM card, which had been stolen during the robbery, and began to track where the card was being used. He stated that he reviewed video surveillance tapes from the ATM machines where the card was used after the robbery and took photographs from the surveillance tape of the man using the card. The photographs were introduced and viewed by the jury.

Ed Eanes, an employee of First American Bank at the time of the robbery, testified that he was contacted by Neighbours concerning ATM activity at his bank, one of the locations where Moulton's card was used after the robbery. He verified that he provided Neighbours with a video surveillance tape of a transaction and the tape was introduced into evidence. He also verified that Neighbours photographed the transaction using the surveillance tape.

Brian Grissom, a loss prevention officer for First Tennessee Bank, introduced records from the bank's ATM machines pertaining to the use of Moulton's ATM card at a First Tennessee Bank. Grissom verified that Moulton's ATM card was used to access her account at two separate First Tennessee Bank ATM machines on January 10, 1997. During the second transaction, which occurred at 2:32 p.m., the card was confiscated. Grissom introduced video surveillance tapes and photographs taken of these transactions.

Sergeant Roleson testified that he used the ATM photographs to target the Defendant as a suspect for the crime. On cross-examination, he reported that he saw a woman in some of the ATM photographs, whom he identified as Joy Rickman, one of the Defendant's roommates. He stated that he knew of three people living with the Defendant in a duplex at the time of the crime.

Gladys Marie Dawson, the Defendant's aunt, identified the Defendant as the person captured on film by the ATM surveillance cameras. She testified that at the time of the crime, the Defendant was living with his girlfriend, Jackie Brown, Brown's mother, Brown's aunt, and "a lot . . . more people" at their home on Kimball. She stated that he also frequented a duplex on Eastport Cove where his sister, Tiffany Dawson, lived. She reported that in addition to the Defendant and his sister, a man named Carl Rickman, his sister, Joy Rickman, and often others as well lived in the duplex.

Sergeant Chad Golden of the Memphis Police Department testified that he was involved in the Defendant's arrest. He stated that at the time of his arrest, the Defendant was wearing a Nike baseball cap with a "white swoosh emblem or logo on it" and a pair of gloves with a red dye stain on the palm of one glove. Golden reported that police also searched the home where the Defendant

was reportedly living with his girlfriend at the time of his arrest. From the home, officers recovered a gold necklace with a "Nike swoosh" medallion, which appeared to be identical to the necklace worn by the suspect in the surveillance videos obtained from bank ATM machines.

Golden also reported that on January 1, 1997, he discovered a stolen, white Chevrolet Camaro Iroc Z-28 parked in an apartment complex parking lot. He stated that the car matched the description of the vehicle used in the robbery. Golden testified that the car was parked adjacent to a concrete drainage ditch running behind the apartment complex and reported that there were footprints in the snow leading from the car to the drainage ditch. Golden stated that the footprints led in the direction of the duplex on Eastport Cove where the Defendant often stayed, which was located a couple of blocks west, "down the drainage ditch," of where the car was parked.

Joseph N. Rinehart of the FBI, assigned to the Memphis Safe Streets Task Force, testified that he obtained consents to search both of the Defendant's residences, the Eastport Cove duplex and the house that the Defendant shared with his girlfriend and her family. Sergeant Mike Kitsmiller of the Memphis Police Department, also assigned to the Safe Streets Task Force, testified that he searched the Defendant's Eastport Cove duplex. He reported that officers recovered from the apartment a pair of shoes, a jacket with a "Nike swoosh" emblem on the back, and a ski mask. Kitsmiller testified that the jacket appeared to be the same jacket worn by the suspect in the surveillance videos from the ATM machines. In addition, Kitsmiller searched the Defendant's home on Kimball, from which officers recovered a baseball cap, a flannel shirt, a gold Nike medallion necklace, and a pistol like the one carried by one of the bank robbers during the robbery. Photographs that were introduced at trial revealed that one of the robbers wore a flannel shirt during the crime.

Special Agent Linda Littlejohn of the Tennessee Bureau of Investigation Crime Laboratory testified that she was a forensic scientist specializing in shoe print comparison, fiber comparisons, and physical comparison. She compared the three shoe prints lifted from the bank counter to the pair of shoes recovered from the Defendant's duplex and concluded that the right shoe made one print "to the exclusion of all others." Special Agent Littlejohn explained that by this, she meant "that this shoe and only this shoe could ha[ve] made [the] print based on the individual characteristic[s] . . . found in the print corresponding to the individual characteristic[s] on . . . [the] right shoe." She also testified that the second print was consistent with the left shoe. She explained that the lack of individual characteristics in the print precluded her from concluding with complete certainty that the left shoe made the print; however, she maintained that either the left shoe or "another shoe exactly like it" made the print. Finally, Littlejohn testified that the third print was consistent with the size, shape, and tread design of the right shoe, but again she stated that based on the lack of individual characteristics in the print, she could not determinatively say that the shoe made the print.

Special Agent John Canale of the FBI testified that he worked as a member of the Safe Streets Task Force in Memphis at the time of the robbery. He stated that he interviewed the Defendant on two occasions, January 16 and 17, 1997. He reported that during the first interview, the Defendant told officers that he lived at both his girlfriend's house and the duplex located on Eastport Cove. During the second interview, the Defendant admitted that he was the person captured

on film by the surveillance cameras at the ATM machines. He also admitted that he had used Moulton's ATM card. However, he claimed to have obtained the card from his mother, whom he said obtained it from her boyfriend.

James Jones, the head of maintenance for the Cottonwood Apartments in Memphis, testified that he recovered a "large amount of purses, assorted papers, credit cards, billfolds and [a] handgun," which was loaded with three live rounds, from a dumpster at the apartment complex. He reported the discovery to police, and Officer J.R. Hester of the Memphis Police Department responded to the call. Hester testified that among the items he found Marpu Moulton's checkbook, her Social Security card, her "Discovery" checkbook, and other assorted papers and receipts belonging to Moulton. Hester also testified concerning the distances between certain locations within his precinct which were pertinent to the investigation of this case: He stated that the Union Planters Bank where the robbery occurred was 1.9 miles from the Defendant's Eastport Cove address and that two of the ATM's from which the suspect withdrew money using Moulton's ATM card were within two and a half miles of the Defendant's Eastport Cove address.

Finally, Thomas Bailey, who owned a gun shop at the time of the robbery, testified that on the evening of December 20, 1996, his shop was broken into, and several guns were stolen. One of the stolen guns was the loaded pistol found in the dumpster at the Cottonwood Apartments. Another of his stolen guns was the pistol recovered by police from the Defendant's Kimball address following the robbery.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first contends that evidence of his identity as the culprit is insufficient to support the verdict beyond a reasonable doubt. He argues that no one present during the robbery could identify either of the two robbers, that no witness recognized the pistol used during the robbery, that no evidence or testimony connected the Defendant with the "getaway" car, and that many items of evidence introduced at trial were recovered by police at residences which the Defendant shared with numerous other people.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.

1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. Furthermore, "[t]he question of appellant's identity as the person who committed the offense [is] for the jury's determination, upon consideration of all the competent proof." State v. Shelley, 628 S.W.2d 436, 438 (Tenn. Crim. App. 1981).

In this case, despite the lack of eyewitness identification of the Defendant as the perpetrator of the crime, the State presented a great deal of evidence linking the Defendant to the robbery. Not only was the Defendant captured on film using Moulton's stolen ATM card, but he admitted to police that he used the card following the robbery. In addition, police found the "getaway" car, which was identified by an eyewitness to the crime, in a parking lot near one of the Defendant's residences, and police found footprints leading from the car toward the Defendant's home. From the Defendant's two residences, police recovered a pair of gloves, one of which was stained with red dye like that used in the bank's "dye packs"; a necklace which appeared to be the same necklace worn by the suspect who used the stolen ATM card after the robbery; a baseball cap like that worn by the suspect; a flannel shirt like that worn by one of the masked robbers, who were photographed by bank surveillance cameras during the robbery; a jacket like that worn by one of the robbers; and a pair of shoes that matched prints lifted from the bank counter. In addition, two stolen pistols were found which had been taken from the same gun shop on the same night; police recovered one pistol from the Defendant's home and the other pistol from a dumpster where Moulton's stolen purse and other stolen items were found. We conclude that this is sufficient evidence from which the jury could have adduced the Defendant's guilt beyond a reasonable doubt. This issue is without merit.

## II.  SENTENCING

The Defendant next argues that the trial court improperly imposed consecutive sentences in this case. He contends that the imposition of consecutive sentences does not reasonably relate to the severity of the offenses in this case or to the necessity of protecting the public. We disagree.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Tennessee Code Annotated § 40-35-115 provides that if a defendant is convicted of more than one offense, the trial court may impose consecutive sentences if the court finds by a preponderance of the evidence that:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> . . .
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> . . .
> (6) The defendant is sentenced for an offense committed while on probation . . . .

Tenn. Code Ann. § 40-35-115(a), (b)(1), (2), (4), (6). Furthermore, "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

We first note that because the trial judge in this case thoroughly considered all relevant facts, circumstances, and sentencing principles, our review is de novo with a presumption of correctness. In sentencing the Defendant, the trial judge noted that the Defendant had previously received "in excess of six Class E or above felony convictions"[1] and therefore determined that the Defendant was a career offender. See Tenn. Code Ann. § 40-35-108(a), (b)(3). The trial judge also determined that the Defendant had "an extensive history of criminal behavior and criminal convictions, in addition to those necessary to make him a career offender." Moreover, the trial court noted that the Defendant was on parole at the time of the present offenses. The trial court further determined that the Defendant was a dangerous offender, stating,

---

[1] The trial judge noted that the Defendant had six prior aggravated robbery convictions, one attempted aggravated robbery conviction, one reckless endangerment conviction, and a misdemeanor conviction for possession of a weapon. The Defendant committed these crimes as a juvenile, but was sentenced as an adult for each of the offenses. See Tenn. Code Ann. § 40-35-108(a), (b)(3).

-7-

the [D]efendant had no hesitation about committing a crime when the risk to human life was high. I think, normally, that in an aggravated robbery, that would be . . . part of the elements of the crime of aggravated robbery. However, in this case, . . . the bank was full of customers . . . and the individual identified as Mr. Gamble . . . leaped upon the counter brandishing a gun, leaped over the counter back behind the tellers' cages, and people were forced to the ground. . . . There was also testimony that there were other individuals, customers in the bank, including a lady who had her children with her during the time all this was occurring.

. . .

And couple that with the fact that [the Defendant] has numerous prior convictions for aggravated robbery – he's on parole for aggravated robbery when he commits this offense – indicates to me that he has no fear. He has no concept or apprehension about being caught, about committing a crime where he arms himself with a pistol, and robs people. Now, on at least seven or eight occasions, he has armed himself with a pistol to rob people. This Court finds he is a dangerous offender.

Finally, the trial judge determined that

confinement for an extended period of time is necessary to protect society. This Court is satisfied that Mr. Gamble cannot live on the streets of free society without committing violent offenses, as is indicated by his record. It's obvious that confinement, once before for aggravated robbery for a short period of time, in this Court's mind didn't work, and society needs to be protected from Mr. Gamble.

And . . . that the aggregate length of the sentences, if consecutive sentencing is ordered, reasonably relates to the severity of the offenses for which the [D]efendant stands convicted. This Court feels that . . . the blazon nature of a bank robbery, the fact that the numerous individuals who were present in the bank whose lives were put in jeopardy and at risk indicates that Mr. Gamble needs to be incarcerated for a long period of time.

We must agree with the findings of the trial court. The Defendant's presentence report reveals a lengthy prior record which is especially lengthy considering that the Defendant was twenty-five years old at the time of sentencing. His record, which dates back to 1986 when the Defendant was twelve years old, includes five convictions for aggravated robbery as well as five other felony convictions as an adult, at least three "felony" adjudications as a juvenile, and other convictions and juvenile adjudications. As the State points out, his record shows "a continuous criminal history." Moreover, by his own admission, the Defendant was on parole for armed robbery at the time he committed his present offenses. We therefore conclude that imposition of consecutive sentences is more than adequately supported by the record in this case.

Accordingly, the judgment of the trial court is affirmed in all respects.