# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. CARLA JUANITA PRINCE

**Direct Appeal from the Circuit Court for Franklin County**
**No. 13983     Buddy D. Perry, Judge**

---

**No. M2003-01098-CCA-R3-CD - Filed April 21, 2004**

---

Following a jury trial, the defendant, Carla Juanita Prince, was convicted of DUI, first offense, a Class A misdemeanor, and reckless driving, a Class B misdemeanor. She was sentenced, respectively, to eleven months, twenty-nine days, suspended except for forty-eight hours, and six months, suspended except for forty-eight hours. The two forty-eight-hour jail terms were ordered to be served consecutively, and the probationary terms were ordered to be served concurrently. Additionally, her driver's license was revoked for one year and she was fined a total of $360. On appeal, the defendant argues that the evidence was insufficient to support her conviction for DUI. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Philip A. Condra, District Public Defender, and David O. McGovern, Assistant Public Defender, for the appellant, Carla Juanita Prince.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Franklin County Sheriff's Deputy Todd Hindman testified that on February 25, 2001, at approximately 1:45 a.m., he observed the defendant, driving a Chevrolet Camaro, pull into the parking lot of Woods Country Mall off Highway 127, pull back out, attempt to pull in again, run upon an eight-inch high concrete curb, back out into the highway, pull back into the parking lot, and then exit through a side entrance. After following her for "maybe a 100 feet," Hindman activated

his blue lights and stopped the defendant. He "noticed that her clothes were real disorganized. Her shirt was misbuttoned, her pants were open. I noticed the smell of alcohol coming from the vehicle." When Hindman asked the defendant if she had been drinking, she replied that she had consumed four beers. Hindman said that the defendant's speech was slurred "to the point that it was somewhat difficult to understand her," and she was "unstable about her feet, but able to stand." He then asked the defendant to stand in front of his patrol car, facing her vehicle, and perform three field sobriety tests. The defendant informed him that she was under a doctor's care for a back injury and refused to take the one-legged stand test. Hindman said that he had to explain the finger-to-nose test to the defendant "multiple times 'cause as [he] was explaining the test [the defendant] was trying to go ahead and do the test." The defendant did not follow his instructions and was swaying. In Hindman's opinion, the defendant failed the finger-to-nose test. Regarding the heel-to-toe test, Hindman said, "[S]he failed the test. She missed several times heel to toe, very unsteady crossing her feet over." He said that he was certain she had failed that test because he had placed that information in the state warrant.

While Hindman was transporting the defendant to the jail, the defendant told him that "the only thing [she was] under the influence of [was] Darvocet and Soma" and that her doctor had prescribed them. Hindman then radioed dispatch that he was taking the defendant to the Southern Tennessee Medical Center, instead of the jail, for blood alcohol and drug tests. At the hospital, Hindman explained the implied consent form to the defendant and asked her to submit to a blood alcohol test and a drug screen, both of which she refused. He then transported her to the jail, read the implied consent form to her, and asked her to sign it indicating her refusal to submit to blood alcohol and drug tests, but she refused to sign the form. Correctional Officer Mike Saint John witnessed the defendant's refusal to sign the form.

On cross-examination, Deputy Hindman said that it was raining during the defendant's field sobriety tests. As to the defendant's finger-to-nose test, Hindman said that she touched the bridge of her nose which was within one-half inch of the tip of her nose. Asked if a breathalyzer test would have been beneficial to the jury, Hindman responded that he "could not determine whether it was the alcohol or her prescription medication that was causing her impairment." On redirect, Hindman said that the odor of alcohol did not dissipate when the defendant got out of her vehicle and that he smelled the odor of alcohol coming from her person. In Hindman's opinion, the defendant was intoxicated.

Franklin County Sheriff's Deputy Ross Peterson testified that he responded to the scene and that he "noticed a strong odor of an alcoholic beverage coming from [the defendant's] person." He said that the defendant's speech "seemed to be slurred, her balance seemed to be unsteady, her eyes looked kind of droopy," and "her pants were unzipped there the whole entire time that . . . [Hindman] was standing there talking to her." The defendant was in the process of performing the field sobriety tasks when Peterson arrived, and it appeared to him that "she was having trouble understanding orders and applying what [Hindman] was asking her to do, in other words, a little non-compliance there." Peterson said that he waited at the scene for a wrecker to tow the defendant's vehicle and that he had no contact with the defendant after she left with Hindman.

Correctional Officer Michael Saint John testified that he was working in the booking area of the jail on February 25, 2001, when Deputy Hindman brought in the defendant who smelled of alcohol and was "staggering pretty much and off balance of her feet." He witnessed Hindman reading the implied consent form to the defendant and her refusal to sign it. Saint John said that the defendant refused to give him the necessary booking information and that "[a]ll she wanted to do was stand there and fuss and argue with us and cuss and carry on." He made a notation in the jailer's log book regarding the problems he had with the defendant and identified a copy of it which was admitted into evidence. Reading from the notation entered in the log book at 3:10 a.m., Saint John said, "[The defendant] being belligerent. . . . [S]he would not answer her questions nor could we get a picture at this time." In Saint John's opinion, the defendant was under the influence of alcohol. Saint John said there was a video camera in the booking area of the jail, and it had been activated when the defendant was brought in because she was a female. He said that the jail administrator was in charge of the tapes, and he did not know how long the tapes were retained.[1]

Celeste Simmons, the defendant's daughter, testified that she went to the defendant's house around lunch time on the day before her arrest and spent the night there. She said the defendant did not drink any alcohol that day but had done so the day before. She thought the defendant had taken some medication that day but did not know what time she had taken it. According to Simmons, the defendant was not stumbling, her speech was not slurred, and she did not have trouble standing after taking the medication. Sometime after Simmons went to bed, a friend of the defendant, Terri, telephoned wanting to speak to the defendant. Simmons took the telephone to the defendant who was in bed. She did not smell any alcohol on the defendant at that time. Simmons then went back to bed and was awakened between 4:00 and 5:00 a.m. the next morning when the defendant called her "to come get her out of jail."

Amy Ingle, the defendant's daughter-in-law, testified that she and her son had spent most of the day before the defendant's arrest with the defendant at her home. When Ingle left the defendant's home between 6:00 and 7:00 p.m. that evening, the defendant did not smell of alcohol, did not have slurred speech or droopy eyes, and was not acting belligerent. Ingle denied that anyone had been drinking that day but acknowledged that, on the preceding evening, her husband and the defendant had drunk beer until about 12:00 a.m. while they were visiting in the defendant's home. Asked how much of the twelve-pack of beer the defendant had drunk, Ingle replied, "She couldn't have drunk too much. I know my husband probably drank more than she did."

The defendant testified that she was forty-seven years old at the time of her arrest and that she was currently on disability as a result of bulging disks in her neck, pain in her shoulders and legs, and arthritis in her knees. She said that she was under a doctor's care for these conditions at the time of her arrest. On the Friday before her Sunday morning arrest, the defendant's son, daughter-in-law, daughter, and two grandchildren came to her home for the evening meal. Her son brought a twelve-

---

[1]At the close of the proof, the State and defense counsel stipulated that any videotape made at the jail during the defendant's booking process was no longer available because the tapes were destroyed after one year.

pack of beer, and she "had three or four beers with him." On the following day, Saturday, her daughter and granddaughter came to her home around lunch time, and her daughter-in-law and grandson arrived later in the day and stayed until "after dark." Her daughter and granddaughter spent the night in her home. The defendant denied drinking any alcohol that Saturday but acknowledged taking "pain pills," muscle relaxers, and anti-inflammatory medication that morning between 6:30 and 7:00 a.m. She said she went to bed around 9:30 or 10:00 p.m. and, sometime after that, her daughter awakened her and told her that Terri was on the telephone. After speaking with Terri, the defendant left for Terri's house. En route, she noticed three police cars at the Woods Country Mall, missed her turn, pulled into the parking lot, bumped a curb because her car was low to the ground, backed out onto the road, and "c[a]me back down and made [her] turn the way [she] was supposed to."

As to the field sobriety tasks, the defendant said she told the officer she could not perform them because of her back, leg, and neck problems. She said that the only test she performed was the finger-to-nose test, during which she touched her nose and did what the officer told her to do. According to the defendant, her "[h]ealth had everything to do with that test." She did not perform the heel-to-toe test because she did not have "very good balance." The defendant said it was "windy and storming and raining" at the time of her arrest. She acknowledged that the officer took her to the hospital and asked her to submit to a blood test, which she refused because she had a tendency to faint when having blood drawn. She said the officer did not offer her a breathalyzer test. She informed the officer that she was not drunk and that the only substance that could possibly have been in her system was her medication which she had taken Saturday morning. Asked about the odor of alcohol emanating from her vehicle when Deputy Hindman stopped her, the defendant explained that her son had spilled a beer in her car on the Friday before her arrest.

On cross-examination, the defendant said it took her about twenty minutes to drive from her house to the Woods Country Mall. She said that the last time she had drunk any beer was about thirty hours prior to her arrest when she drank three or four beers. Asked about her disheveled appearance at the time of her arrest, the defendant said she did not remember her clothes "being that way." She said she had "jumped out of bed and put [her] clothes on" and acknowledged that she "looked pretty rough." The defendant said she had been taking Soma for "a long time" and agreed that Soma and Darvocet are "pretty powerful narcotics." Asked if she had combined alcohol with her medication on the Friday before her arrest, the defendant said, "I had take[n] my medicine that morning and drank the alcohol that afternoon." She denied that doing so had constituted "a combination" but agreed that Darvocet, Soma, and alcohol "should not go together." She acknowledged that she had read the literature which accompanied her medications from the pharmacy and said she knew she was not supposed to combine alcohol with her medications. She did not recall having any difficulties with the jailers at the jail on the morning of her arrest but acknowledged that she refused to answer their questions.

-4-

# ANALYSIS

## Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support her conviction for DUI, saying that "any conclusion drawn by the officer as to [her] completion of the field sobriety tasks were [sic] overshadowed by the fact that [she] had a back injury for which [s]he was under [a] doctor's care." She also argues that the unavailability of the videotape made during her booking process, "and the fact that the tape was destroyed for no apparently good reason, is indicative that the State did not present sufficient evidence to convict [her] of the charged crimes." She claims that it was "blatantly unfair . . . to be convicted of a crime when the arresting agency had available such significant proof and yet failed to maintain it properly in a manner that the jury could have observed it and made a determination with all facts presented to them."

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of violating Tennessee Code Annotated section 55-10-401(a), which provides:

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

> (1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or
>
> (2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more.[2]

Viewed in the light most favorable to the State, there was sufficient evidence from which the jury could conclude that the defendant was under the influence of alcohol at the time of her arrest. Deputy Hindman, the arresting officer, testified that the defendant had an odor of alcohol coming from her person and her vehicle, her speech was slurred, and she was unstable on her feet. When Hindman asked the defendant if she had been drinking, she told him she had consumed four beers. Deputy Peterson testified that the defendant smelled strongly of alcohol, her speech was slurred, her eyes were "kind of droopy," and her balance was unsteady. Correctional Officer Saint John testified that when the defendant was brought in to the jail, she still smelled of alcohol and was staggering. This court has previously held that the testimony of the arresting officer is sufficient to prove the offense of driving under the influence. See State v. Vasser, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993). Accordingly, we conclude that the evidence was sufficient for a reasonable jury to find the defendant guilty of DUI.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

---

[2] Effective July 1, 2003, subsection (2) was amended to: "The alcohol concentration in such person's blood or breath is eight-hundredths of one percent (.08%) or more."