IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2012

**STATE OF TENNESSEE v. JOSEPH DAVISON**

**Appeal from the Circuit Court for Madison County**
**No. 11-17     Donald H. Allen, Judge**

**No. W2011-01963-CCA-R3-CD  - Filed September 5, 2012**

Following a jury trial, the defendant, Joseph Davison, was convicted of two counts of rape and sentenced to twelve years for each count, to be served consecutively in the Department of Correction.  On appeal, the defendant argues that the trial court erred in denying his motion to dismiss the indictment based upon the fact that the original charges filed against him only identified his DNA profile, and he was not identified by name until after the statute of limitations had expired.  He also challenges the sufficiency of the evidence and imposition of consecutive sentencing.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Gookin, Assistant Public Defender, for the appellant, Joseph Davison.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In this matter, the victim was raped by an unknown male on June 27, 1997.  Testing of the vaginal swabs taken from the victim produced a DNA profile of the perpetrator.  On June 9, 2005, the City Court of Jackson, Tennessee, issued a "John Doe" state warrant for the defendant, identifying him only by his DNA profile.  Subsequently, in October 2010, the defendant was developed as a suspect and a DNA comparison was ordered.  The warrant was

amended in November 2010 to reflect the defendant's name after confirming that the defendant's DNA matched the DNA profile extracted from the victim's vaginal swabs, and the defendant was subsequently arrested.

At trial, the victim testified that, at the time of the offenses, she was forty-two years old and teaching at Lane College. She was leaving for Vanderbilt a week later to finish her doctorate degree in University Administration. She said that she awoke around 4:45 a.m. on June 27, 1997 to see a young man with a towel around his head, standing at the end of her bed. After telling the victim to be quiet, the man put some pillows over her face and performed oral sex on her, inserting his tongue into her vagina. The man then inserted his fingers and his penis inside her vagina while she mumbled into the pillow, "I'm scared" and "[P]lease stop." The victim waited until she thought the man had left the house before she woke her husband, who was asleep in another bedroom, at about 5:15 a.m. to tell him that she had been raped. Her husband called the police, and she subsequently went to the hospital where she underwent a sexual assault examination.

The victim further testified that she was unable to identify her attacker because she only saw him from "the eyes up." She stated that she did not consent to any sexual contact and that she did not fight back because she "was frozen like that."

The victim's husband[1] testified that his wife woke him on the morning of June 27, 1997, and told him that she had been raped. He walked around the entire house to ensure the assailant was gone. He discovered that the back door, located between the kitchen and the bedroom where the rape occurred, was unlocked and only partially closed. He surmised that someone had exited the house through that door. As he checked outside, he found one of the neighbor's plastic chairs underneath the victim's office window and saw that the screen had been cut.

Chad D. Johnson, a Special Agent assigned to the forensic services division at the Tennessee Bureau of Investigation ("TBI"), testified as a DNA expert witness for the State. He confirmed that he was able to develop a DNA profile in March 2000 from the vaginal swabs taken from the victim and received buccal swabs taken from the defendant in October 2010. He developed a DNA profile from those buccal swabs, compared it to the DNA profile extracted from the vaginal swabs, and determined that they matched. According to his statistical analysis, Special Agent Johnson "found that the probability of an unrelated individual having the same DNA profile [as the defendant] would exceed the world's population which means that [the lab] would not expect to find that profile anywhere else in

---

[1]Although married at the time of the rape, they were divorced at the time of the trial.

the world."

Captain Mike Holt of the Jackson Police Department testified that he became involved with the victim's case in 1998. He developed the defendant, who was living in Illinois at the time, as a new suspect in 2010. Through the assistance of the Chicago Police Department, Captain Holt obtained buccal swabs from the defendant for purposes of making a DNA comparison against the victim's vaginal swabs. He received a report from the TBI in November 2010 confirming that the DNA on the two swabs was a match. After receiving these results, Captain Holt worked with the district attorney's office and police department in Chicago and had the defendant arrested and transported to Tennessee. He asked the defendant during the initial interview if he knew "what the arrest warrant was about." The defendant made an oral statement, which was reduced to writing by Captain Holt, adopted by the defendant, and read by Captain Holt at trial:

> I know where Arlington Street is. I had a woman who worked for me who stayed on Arlington in a white house with blue trim or a blue house with white trim. She would bring me like 200 or 300 a day. She lived alone as far as I know. She didn't want her family to know me so I would come in through the living room window. She didn't want anybody to know because I was black. I knew her as Stiletto. . . . Stiletto was white, about 26/28, about 6' or 6'1", slim build, blonde straight hair that came past her shoulder. . . . In June or July, I borrowed $300 that was a loan. . . . I told her I would pay her back, but I moved to Chicago so I never got to pay her back. If she was the one who complained, me owing her money is the only reason I can think of for her saying I raped her.

Captain Holt testified that, since the defendant's statement referenced a woman in her twenties with blonde hair, he asked the defendant if he remembered or was involved with a woman in her forties with dark hair. The defendant answered in the negative.

The State called Christina Lott McKnight who testified that, in 1997, she was living with a friend in a blue house on Arlington Street and was acquainted with the defendant. She admitted that she had sex with the defendant in exchange for drugs, and the defendant came to the house approximately twice. He entered through the back of the house because her friend's father was "against different races mixing." McKnight said that the defendant called her "Stiletto." When McKnight was shown a photograph of the victim's house, she testified that it was across the street and to the right, "kind of at an angle," from the house where she lived.

The defendant testified that he met the victim in the summer of 1997 when she walked past him in his father's neighborhood. He asked the victim if she was interested in being a prostitute, and she answered in the affirmative. When shown photographs of the victim's brick home, the defendant stated that he was at the victim's house more than once, that he and the victim had sex "[n]o more than ten times," and that the sexual encounters occurred for almost two months. He also stated that the victim, while working as a prostitute, gave him half of anything she earned. The defendant denied going into the victim's house without her permission, denied ever wearing a towel around his face, and denied ever threatening or coercing her into having sex.

Regarding the testimony by McKnight, the defendant stated, "I was given in discovery a photo and I studied it for like a week to try my best to remember [McKnight's] face and it just couldn't pop in. I just couldn't remember no type of relationship back in '97 with her."

## ANALYSIS

### I. Motion to Dismiss Indictment

The defendant argues that the trial court erred in its denial of his motion to dismiss the indictment because the criminal prosecution against him did not commence until after the warrant was amended to include his name in November 2010, which occurred over five years after the statute of limitations expired. The warrant, initially issued in June 2005, previously only listed the defendant's DNA profile and "John Doe." The defendant argues that the use of a "John Doe" warrant is insufficient to put him on notice of pending criminal prosecution and that the "John Doe" warrant does not toll the statute of limitations.

This court has already addressed whether a John Doe warrant tolls the applicable statute of limitations in its recent decision upholding a defendant's conviction for attempted aggravated rape. This court held that a "John Doe warrant coupled with a DNA profile of an unknown suspected offender obtained before the expiration of the applicable statute of limitations may validly commence a criminal prosecution and toll the statute of limitations." State v. Robert Jason Burdick, No. M2010-00144-CCA-R3-CD, 2011 WL 6020569, at *6 (Tenn. Crim. App. Dec. 2, 2011), perm. app. granted (Tenn. Apr. 11, 2012).

In the current case, it is undisputed that the rape occurred on June 27, 1997. The defendant was convicted of the Class B felony of rape, which has an eight-year statute of limitations. Tenn. Code Ann. § 40-2-101(b)(2). Based on the affidavit from Lieutenant Mike Holt, a state warrant was issued on June 9, 2005, eighteen days before the statute of limitations expired. The Affidavit of Complaint/State Warrant named "John Doe who is otherwise known by (STR) DNA Profile . . . ," as committing the offense of "Rape (2

-4-

counts).” The State’s DNA expert testified that the defendant’s DNA sample matched the sample developed from the victim’s vaginal swab, which was the same DNA identifier listed on the warrant. After reviewing the record and applying the holding in Burdick, we conclude that the issuance of the state warrant on June 9, 2005, listing “John Doe” along with the defendant’s DNA profile was sufficient to toll the statute of limitations.

## II. Sufficiency of the Evidence

The defendant’s second argument is that the evidence is insufficient to sustain a conviction of either count of rape because he testified that the sexual intercourse was consensual. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is “whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) (“Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.”); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). “A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.” State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

The crime of rape, in pertinent part to this case, is the unlawful sexual penetration of a victim by the defendant accompanied by force or coercion or when the sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent. Tenn. Code Ann. § 39-13-503(a)(1), (2).

The victim testified that the defendant, whom she did not know or give permission to be in her house, penetrated her first with his tongue and again with his penis. The victim further testified that the defendant obscured his identity by wrapping a towel around his face and placing pillows over the victim’s face. The State’s DNA expert witness testified that the defendant’s DNA matched the DNA profile extracted from the victim’s vaginal swabs. As to the accuracy of that match, the DNA expert stated that the “probability of an unrelated individual having the same DNA profile [as the defendant] would exceed the world’s population.” According to testimony from all witnesses, we conclude that a reasonable jury could have found sufficient evidence to sustain a conviction against the defendant for two counts of rape.

## III. Sentencing

The defendant's third argument on appeal asserts that the trial court erred in its imposition of consecutive sentencing. This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). "This presumption is 'conditioned upon an affirmative showing in the record that the trial [judge] considered the sentencing principles and all relevant facts and circumstances.'" State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999) (quoting State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997)). If the trial court fails to comply with the statutory directives, "there is no presumption of correctness and our review is de novo." State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

At the sentencing hearing, the trial court first determined that the defendant was a Range I offender, which placed the defendant in the eight- to twelve-year sentencing range. The court found three applicable enhancement factors in determining sentence length: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; the defendant failed to comply with the conditions of a sentence involving release into the community; and the defendant was on probation at the time the felony was committed. See Tenn. Code Ann. § 40-35-114(1), (8), (13). Although the defendant argued that he had solid family support, had obtained his GED, and had not received a criminal charge against him since 2006, the court found no mitigating factors and sentenced the defendant to twelve years. As we understand it, the defendant does not appeal his sentence length but argues that the trial court erred in imposing consecutive sentences.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in the Tennessee Code Annotated section 40-35-115(b) apply. Additionally, if the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, the court must find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999).

The court found three factors to be important when it imposed consecutive sentencing: the defendant was an offender whose record of criminal activity was extensive; the defendant was being sentenced for an offense committed while on probation; and the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation to commit a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b). The defendant's criminal history included four felony convictions, three misdemeanor convictions, and testimony from the defendant admitting that he made a living as a pimp. The court also pointed out that in July 1996, the defendant was released on bond after being charged, and later convicted, of aggravated burglary and attempted rape. In September 1996, while out on bond in those cases, the defendant was charged in another county and convicted of theft of property. The defendant was granted probation for the theft conviction in January 1997 and, while on probation, committed the rape offenses at issue. The court further recounted, in detail, the evidence presented at trial regarding the break-in and rape when it indicated that the defendant was a dangerous offender.

Additionally, the court found that the imposition of consecutive sentencing reasonably related to the severity of the offenses and described the circumstances surrounding the offenses as aggravated. The court specifically found that the defendant cut the screen out of a window, broke into the victim's home in the early morning hours, approached the victim as she lay asleep in her bed, and repeatedly raped her. After the rapes, the victim had to undergo a sexual assault examination, year-long testing for sexually transmitted diseases, and professional therapy. The court also found that confinement of twenty-four years was necessary to protect society "from this defendant who has an unwillingness to lead a productive life and [who] resorts to criminal activity in furtherance of his anti-societal lifestyle," referencing the defendant's statement about making a living as a pimp.

Upon review of the sentencing record, we note that the trial court provided detailed reasoning for three factors supporting an order of consecutive sentencing, although only one is required. The defendant concedes in his appellate brief that he was on probation at the time of the offenses at issue but asks this court to reconsider in light of the fact that the defendant cannot receive probation. However, the trial court acknowledged that the defendant was ineligible for probation for these offenses in its opening comment before announcing its sentencing decision. The court stated, "[T]hese are both Class B felony offenses and are both non-probatable and non-suspendable offenses[.]" Additionally, the court is not required to consider the defendant's lack of opportunity for probation when determining whether to impose consecutive sentences. Therefore, we conclude that the trial court considered all relevant evidence and sentencing principles relating to the issue of multiple convictions and, accordingly, affirm the imposition of consecutive sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE