IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 25, 2022

**STATE OF TENNESSEE v. DENZEL WASHINGTON**
**Appeal from the Criminal Court for Knox County**
**No. 116283   G. Scott Green, Judge**

_____

**No. E2021-00153-CCA-R3-CD**

_____

Defendant, Denzel Washington, was convicted following a jury trial of possession of heroin with intent to sell or deliver within 1,000 feet of a childcare agency (Count 1), possession of fentanyl with intent to sell or deliver within 1,000 feet of a childcare agency (Count 2), possession of marijuana (Count 3) and delivery of heroin within 1,000 feet of a childcare agency (Count 4). The trial court ordered Defendant to serve an effective nine-year sentence. On appeal, Defendant argues that the evidence was insufficient to support his convictions and that his convictions in Counts 1 and 2 should have merged. Following our review of the entire record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

J. Liddell Kirk (on appeal), Knoxville, Tennessee, and Clinton Frazier (at trial), Maryville, Tennessee, for the appellant, Denzel Washington.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Molly T. Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

This case arises from surveillance by law enforcement of Defendant's interactions with a confidential informant ("CI"), where law enforcement arranged for the CI to

schedule the attempted purchase of heroin from Defendant to aid law enforcement's effort to arrest Defendant on an outstanding warrant.

*Trial Proof*

Investigator Philip Jinks with the Knoxville Police Department (KPD) had worked in the Organized Crime Unit since 2015. Investigator Jinks testified to his experience and training in the field of law enforcement, and specifically narcotics investigations. According to Investigator Jinks, heroin was "the number one issue" in the community. Investigator Jinks testified as an expert in drug investigations, stating that drug sales are conducted primarily with cash, which often results in drug dealers carrying large amounts of cash. Investigator Jinks also testified that in order to evade detection, drug dealers frequently drive rental cars or cars not titled in their own names. He also testified that a drug user typically only purchases between one-tenth of a gram to one-half gram of heroin and that drug dealers commonly possess firearms.

Regarding Defendant's case, Investigator Jinks testified that he received a call from a CI with whom he had worked in the past, notifying him that Defendant was in Knoxville. Investigator Jinks was aware that Defendant had an unrelated outstanding warrant for his arrest. In an effort to take Defendant into custody, Investigator Jinks instructed the CI to call Defendant to arrange for a delivery of heroin without actually completing the transaction so that Defendant could be arrested on the outstanding warrant. Several phone calls between the CI and Defendant were recorded and played for the jury. The CI and Defendant arranged to meet near the CI's house for the purchase of the heroin. In the two phone calls, the CI told Defendant that he was "sick" and asked him to "come down" in an effort to get Defendant to come to the CI. According to Investigator Jinks, heroin addicts often "go into withdrawal sickness, [and] they become violently ill." Eventually, the CI and Defendant agreed to meet at the CI's residence with Defendant saying that he would be "there" in fifteen minutes.

Investigator Jinks testified that he did not intend for a controlled buy to occur. The intention was to conduct surveillance on the meeting and to arrest Defendant on the outstanding warrant when he arrived at the CI's house. Investigator Jinks established surveillance near the location and observed Defendant arrive at the house in a red vehicle, but he was unable to observe the meeting itself. Following the meeting between the CI and Defendant, Investigator Jinks learned that, despite his instructions, the CI had purchased narcotics from Defendant. As Defendant was driving from the CI's house, Officer Pickens pulled Defendant over and arrested him. Investigator Jinks was present during Defendant's stop and arrest, and at trial, he identified Defendant as the man who was stopped.

Upon Defendant's arrest, Investigator Jinks searched Defendant's vehicle, which was later confirmed to be a rental car, and observed a strong odor of marijuana emanating from the car. Investigator Jinks recovered $514 in cash, a "relatively small" amount of marijuana, and a digital scale, "a very common tool . . . that's found in drug distribution cases," from Defendant's rental car. As Investigator Jinks searched Defendant and his car, Investigator Brandon Stryker recovered from the CI one "small baggie that appeared to have a brown rock-like substance." Following Defendant's arrest, Investigator Jinks learned that Defendant rented a storage unit at Wilson Road Self Storage. Investigator Jinks then obtained and executed a search warrant for Defendant's storage unit and found a handgun, ammunition, and a pollen press, which is a device often used to grind narcotics into powder and to mix heroin with other substances, such as fentanyl.

Investigator Jinks then interviewed Defendant. Investigator Jinks warned Defendant that if he had narcotics in his possession that he did not disclose, Defendant could incur additional felony charges for having brought narcotics into the detention facility. Defendant then removed from his "buttocks" a substance that was later confirmed by Agent Carl Smith to be a mixture of heroin and fentanyl. Investigator Jinks double-bagged the substance and transported it to the Property Unit of the KPD, along with the substance collected from the CI. Both substances were submitted to the Tennessee Bureau of Investigation (TBI) for analysis.

On cross examination, Investigator Jinks acknowledged that although drug dealers typically carry large sums of cash, the fact that Defendant possessed $514 in cash did not necessarily confirm that he was a drug dealer. Investigator Jinks also acknowledged that no usable prints were recovered from the pollen press found in Defendant's storage unit. Further, Investigator Jinks conceded that although drug dealers often drive rental cars, the fact that Defendant was driving a rental car does not "in and of itself" indicate that he was involved in drug dealing. Investigator Jinks did not find usable fingerprints on the gun recovered from Defendant's storage unit, although he testified, "that's not unusual with firearms . . . they're not very conducive for lifting prints."

Investigator Brandon Stryker testified that he was called to the CI's residence to collect an amount of heroin from a CI. Investigator Stryker had been trained in narcotics and identification of controlled substances. He received a brown, rock-like substance from the CI which he believed to be heroin. Investigator Stryker sealed the substance and submitted it to the KPD property unit for submission to the TBI for analysis.

Agent Carl Smith of the TBI testified as an expert in forensic chemistry. Agent Smith initially received two items to test, a rock-like substance and a plant material. He later received an additional envelope containing a rock-like substance. Agent Smith visually analyzed each substance that was submitted. Because the later-supplied rock-like

substance was visually similar, he did not initially analyze it "because it would not exceed 15 grams." He did later analyze the second rock-like substance. Agent Smith conducted the "yellow" and "violet" color tests from which he "thought it should probably be an opiate, and the material looked consistent to be like heroin." After running the substance on the GC mass spectrometer, he confirmed that both rock-like substances contained heroin and fentanyl. He also weighed the first substance at 4.68 grams. The second rock-like substance was weighed with the "baggie and the material together" at 1.3 grams. Agent Smith testified that heroin is a schedule I controlled substance and fentanyl is a schedule II controlled substance. Agent Smith also confirmed that the plant material was .34 grams of marijuana, which is a schedule VI controlled substance. On cross-examination, Agent Smith agreed that the TBI only does quantitative analysis on hemp and marijuana. He said his testing of the rock-like substance did not break down the constituent parts to determine the concentration of heroin and fentanyl in the sample he tested. Between the two rock-like substances tested, he did note that in reviewing the abundance peak in each substance, "there were similar abundances compared to each other in like – there were similar concentrations."

Donna Roach of Knoxville Geographic Information Systems ("KGIS") testified as an expert in the field of "map making." KGIS completes the mapping for Knox County, including plan copying, topography mapping, aerial mapping and restricted areas. Ms. Roach testified that in this case she was asked to create a map illustrating 1,000 feet from the property line of First Step childcare facility in shaded boundaries. Ms. Roach explained that the map reflects the zones in which a person holding drugs may be charged with a drug-free zone violation. After creating and analyzing the map of First Step childcare facility, and the drug-free zone surrounding it, Ms. Roach testified that the CI's residence was "well within" the 1,000-foot boundary. The parties stipulated that First Step childcare was operating as a childcare agency on the date of the offenses in 2018.

After the State rested, Defendant made a Rule 29 Motion for Judgment of Acquittal on the basis that the CI did not testify. Trial counsel argued that the State had failed to prove delivery given that the evidence supported the CI's having disappeared for an hour during the time of the alleged delivery, and the CI did not himself testify that Defendant delivered the narcotics to him. However, the trial court found that when viewed in the light most favorable to the State, there was proof in the record, including recorded phone calls between the CI and Defendant where the trial court heard the CI telling Defendant, "I'm sick, I need something. I need something. I need something." The trial court reasoned that soon after the recorded phone calls, Defendant was stopped with "almost five grams of heroin and fentanyl" hidden in his possession. Further, the trial court recalled that Agent Stryker testified that he had gone to the location of the CI's residence on Sanborn Avenue and that the CI handed him a packet containing heroin and fentanyl. The trial court

concluded, "I think circumstantially, there has been proof of delivery." Following a *Momon* colloquy, Defendant elected not to testify.

Based on the foregoing evidence, the jury convicted Defendant of all four counts charged in the indictment and assessed fines.

*Sentencing*

At the sentencing hearing on February 21, 2020, both parties agreed that Defendant was a Range I offender. No testimony was heard, but Defendant addressed the court saying, "I take full responsibility in my actions. I just ask that you give me a chance, I'll get back to my family and do the positive things I was doing before I started selling drugs." Following arguments, the trial court concluded that it could consider the evidence brought against Defendant in a previous trial, of which charge Defendant was acquitted. The trial court applied Enhancement Factor 8 based on Defendant's uncontested prior criminal history and sentenced Defendant as follows: nine years in Count 1 with the first eight to be served at one hundred percent; four years in Count 2; eleven months and twenty-nine days in Count 3; nine years in Count 4 with the first eight to be served at one hundred percent, all to be served concurrently.

A motion for new trial was heard and denied on January 11, 2021. Although that transcript is not included in the appellate record, the motion for new trial raises the following issues: (1) that the evidence was insufficient to support a verdict of guilty on each count of the indictment; (2) that the weight of the evidence does not support a verdict of guilty on each count of the indictment; and (3) that the trial court erred in failing to grant Defendant's motion in limine to exclude evidence that Defendant possessed firearms. Notably, while Defendant argued at the sentencing hearing that Counts 1 and 2 should merge, Defendant did not raise this issue in his motion for new trial.

**Analysis**

On appeal, Defendant argues that the evidence was insufficient to support his convictions and that his convictions in Counts 1 and 2 should merge. Defendant specifically argues that the evidence to support his convictions in Counts 1 and 2 was insufficient because the mixture of heroin and fentanyl that he possessed was for his personal use. Defendant asserts that the evidence supporting his conviction in Count 4 was insufficient because no witness observed the sale or its exact location. The State argues that the evidence was sufficient to support Defendant's convictions and that Defendant's waived his merger argument. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins,* 102 S.W.3d 578, 581 (Tenn. 2003). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan,* 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews,* 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett,* 788 S.W.2d 559, 561 (Tenn. 1990). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

It is an offense for a defendant to knowingly possess a controlled substance with intent to manufacture, deliver or sell the controlled substance. T.C.A. § 39-17-417(a)(4). Heroin is a schedule I controlled substance, and fentanyl is a schedule II controlled substance. *Id.* §§ 39-17-406(c)(11), 39-17-408(c)(9). The jury may infer from the amount of the drugs, along with the relevant facts surrounding the arrest, that the drugs were possessed for the purpose of selling or otherwise dispensing them. *Id.* § 39-17-419; *see also State v. Holt,* 691 S.W.2d 520, 522 (Tenn. 1984). It is an offense for a Defendant to knowingly deliver a controlled substance. *Id.* § 39-17-417(a)(2). A person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. *Id.* § 39-11-302(b).

Defendant does not contest that he knowingly possessed a substance containing a mixture of heroin and fentanyl within 1,000 feet of a childcare agency. Rather, he argues that he possessed the narcotics for personal use. Defendant suggests that the evidence presented proved only that he possessed narcotics for his own use, some cash, and two mobile phones. Further, Defendant complains that no witnesses offered evidence as to the exact location of the narcotics transaction. Therefore, Defendant argues that the delivery could have occurred outside of the 1,000-foot drug-free zone surrounding the childcare

agency and that the evidence did not prove beyond a reasonable doubt that the delivery occurred within the drug-free zone.

To the contrary, when viewed in the light most favorable to the State, the evidence adduced at trial showed that Defendant was in contact with a CI who claimed to be "sick" and "needed something" to which Defendant replied that he would meet the CI at the CI's residence. Investigator Jinks testified that when heroin addicts "don't get an opiate . . . they go into withdrawal sickness, they become violently ill." Investigator Jinks further explained, "that's a very common thing that we hear and that we hear on wiretap investigations, and we hear from interviews and informants is they'll tell their dealer sometimes, you know. They're trying to speed them up and say, he, I'm sick. I'm getting sick. I need you to come—I need you to come down." Ms. Roach testified that the CI's residence fell "well-within" the 1,000-foot drug-free zone surrounding First Step childcare facility. Investigator Jinks testified that he observed Defendant arrive to meet the CI, although he did not directly observe the delivery. Investigator Jinks then observed Defendant drive from the CI's residence, at which point Investigator Jinks was informed that the CI had actually purchased narcotics from Defendant. Defendant was subsequently stopped pursuant to an outstanding warrant in a separate case. Defendant was found to be driving a rental car, was in possession of $514 in cash, and possessed marijuana and a mixture of heroin and fentanyl, hidden in Defendant's "buttocks area." TBI Agent Smith confirmed through testing that two of the three tested substances were a mixture of heroin and fentanyl. Pursuant to a warrant obtained by Investigator Jinks to search a storage unit held in Defendant's name, Investigator Jinks located a firearm and drug paraphernalia, including a digital scale and a pollen press. Investigator Jinks explained that in his experience, drug dealers often carry large sums of cash, drive rental cars, possess firearms and hold larger quantities of narcotics than a drug user.

The evidence establishes that Defendant possessed and delivered a substance containing both heroin and fentanyl within 1,000 feet of a childcare agency. Defendant concedes that he possessed a quantity of narcotics larger than what is typical for a drug user; however, he maintains that the drugs were possessed for his personal use and that he simply kept a longer-term supply. The jury was entitled to credit Investigator Jinks' testimony and to infer from the quantity of the drugs, and the circumstances surrounding the arrest, that Defendant possessed the drugs with the intent to sell or deliver. Viewing the proof in the light most favorable to the State and discarding all countervailing proof, a reasonable jury could conclude that Defendant committed the offenses for which he was convicted. Thus, the proof is sufficient to support Defendant's convictions. Defendant is not entitled to relief.

Defendant next argues that his convictions for Count 1, possession of heroin with intent to sell or deliver and Count 2, possession of fentanyl with intent to sell or deliver,

should merge because he possessed only one rock-like substance that contained a mixture of heroin and fentanyl. Defendant contends that the singular mixture constitutes the commission of only one offense. We note that Defendant does not support this position with any legal authority. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Ct. Crim. App. 10(b); *see also* Tenn. R. App. P. 27(a)(7). Additionally, Defendant failed to make this argument in his motion for new trial. Our rules of appellate procedure require that "in all cases tried by a jury, no issue presented for review shall be predicated upon an error . . . upon which a new trial is sought, unless the same was specifically stated in the motion for a new trial; otherwise such issues will be treated as waived." *State v. Linda Nell Culver,* No. W2004-00376-CCA-R3-CD, 2005 WL 1683499, at *4 (Tenn. Crim. App. July 19, 2005) (citing Tenn. R. App. P. 3(e)); *see also State v. Martin,* 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). Further, when a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. *State v. Ballard,* 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch,* 646 S.W.2d 158, 160 (Tenn. 1983)). Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *Id.* at 561 (citing *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Absent the necessary relevant material in the record, an appellate court cannot consider the merits of an issue. *See* T.R.A.P. 24(b). Here, Defendant failed to include the transcript of his motion for new trial. Accordingly, we conclude that the issue has been waived and decline to address its merits.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JILL BARTEE AYERS, JUDGE